# Illinois Official Reports

## Appellate Court

---

### *People v. Ware*, 2019 IL App (1st) 160989

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KATO WARE, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-16-0989 |
| Filed | May 20, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-21971; the Hon. Clayton J. Crane, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Jonathan Pilsner, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Brian A. Levitsky, Assistant State's Attorneys, of counsel), for the People. |

Panel                    JUSTICE GRIFFIN delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice Walker concurred in the judgment and opinion.
Justice Walker also specially concurred, with opinion, joined by Presiding Justice Mikva.

**OPINION**

¶ 1    Defendant Kato Ware killed Sidney McDowell following an argument. Defendant has never maintained that he did not kill McDowell, but he argues that McDowell was killed during a struggle for the gun and, thus, that he cannot be guilty of anything more than involuntary manslaughter. A jury found defendant guilty of first degree murder, and the court sentenced him to 30 years in prison. Defendant now challenges his conviction for first degree murder, and we affirm.

¶ 2                                I. BACKGROUND

¶ 3    On May 17, 2012, Sidney McDowell and his friend, Emmanuel Barnett, were walking in the area of 80th Street and Laflin Street in Chicago. They came across another friend, Eric Washington, who approached them and said that defendant had just pulled a gun on him. Washington said that when defendant pulled the gun on him, defendant accused him of not paying the "tax" for selling drugs in the neighborhood. Defendant told Washington not to come into the neighborhood anymore. Washington told McDowell and Barnett about the incident, and Washington was enraged by having a gun pulled on him by defendant.

¶ 4    McDowell, Barnett, and Washington decided to go to a restaurant in the neighborhood. As they walked down the block, they saw a group of people, including defendant, on the front porch of Brianna Gary's house. McDowell approached defendant and asked him why he had pulled a gun on Washington. The conversation reportedly began civilly, but it escalated to include a personal disagreement between defendant and McDowell. McDowell and defendant began yelling, swearing, and threatening each other. At that point, defendant instructed another man, Clear Huddleston, to get him a handgun that had been concealed in the bushes in front of the house. Huddleston obliged.

¶ 5    The dispute continued, now with defendant in possession of a firearm. Defendant came down the porch steps and pointed the weapon at McDowell as arguing continued. An individual named Jamael came down the steps from the porch and stood between defendant and McDowell and tried to defuse the situation. McDowell walked away across the street and made a phone call in which he instructed Darrell Williamson to bring him a gun. Defendant then ran over toward McDowell and, from about three or four feet away, pointed the gun at McDowell's face. The parties continued arguing.

¶ 6    McDowell told defendant that he was not scared of him, and that if defendant was going to point a gun at his face, he better "put it up." At this point, the testimony began to conflict about what happened next, and it is central to this appeal. Defendant claims that the testimony about the subsequent events demonstrated that the parties struggled over the gun and that the gun went off as a result of the struggle, so defendant could be guilty of no more than involuntary

- 2 -

manslaughter. The State, however, claims that the testimony demonstrated that defendant committed first degree murder.

¶ 7    Several people witnessed the killing. Emmanuel Barnett testified that when defendant ran toward McDowell, the two of them stood face-to-face about three or four feet apart with defendant holding a gun up near McDowell's face. Barnett testified that McDowell "tried to get the gun out of his face" and "smacked the gun"—slapped once at the top of defendant's hand. Then Barnett heard a gunshot, and McDowell dropped to the ground. Barnett testified that he never saw McDowell grab defendant's arm, grab the gun, or touch the gun.

¶ 8    Eric Washington, the one who originally had the confrontation with defendant, testified that both he and defendant sold drugs in the area. His dispute with defendant arose from his refusal to pay taxes to defendant in order to sell drugs in the neighborhood. Washington testified that when defendant ran up to McDowell with a gun pointed at him, defendant and McDowell "tussled," there was a gunshot, and McDowell fell to the ground. Washington testified that McDowell never touched the gun.

¶ 9    Marshawn Petty, a neighbor, observed the events from his house. He heard loud arguing outside, so he looked out the window. He knew McDowell and recognized him. He saw defendant cross the street, approach McDowell, and point a gun at McDowell's face. Petty testified that McDowell "lurched," they had "a toggle," and had a "little wrestle and tug." Petty testified that McDowell tried to grab the gun, lunged for it, but that defendant yanked it back. And when defendant yanked it back, McDowell was off balance and the gun went off, striking him in the chest. Petty testified that McDowell's hands were off of defendant by the time the gun discharged, and that defendant seemed surprised by what he had done and ran off.

¶ 10   Brianna Gary, whose house defendant was at before the confrontation, saw parts of the encounter through a window of the house. Gary testified that she saw defendant approach McDowell at a fast pace and she saw defendant raise his arm, but she could not see his hand because there was a tree blocking her view. She went to a different room of the house and heard the gunshot but did not see it happen. She returned to the window and saw McDowell lying on the ground and observed that defendant was no longer present.

¶ 11   None of the witnesses were particularly cooperative with the police investigation. None of them came forward on the day of the shooting, and they all talked to investigators days or weeks later. Several police officers testified about the investigation. They apprehended defendant about two weeks later when the police received an unrelated call about a person with a gun. When the officers arrived to investigate, defendant and another man fled and discarded a weapon. The police later learned that defendant was the person who had killed McDowell. Scientific analysis revealed that the bullet recovered from McDowell's body was fired from the weapon recovered by the police that was discarded when the men fled.

¶ 12   The medical examiner testified and stated that the evidence indicated that McDowell was killed by the gunshot and that he had been shot from a distance of less than two feet. A detective that analyzed the weapon testified that it would have taken 8½ pounds of pressure on the trigger to fire the weapon, so it was neither a stiff trigger nor a hair trigger.

¶ 13   The case went to the jury. The trial court, on request from defendant, instructed the jury on second degree murder and on involuntary manslaughter. During deliberations, the jury sent out notes with questions. One of the questions was "If we are to select the charge of second degree murder, do we still have to consider the additional gun charge or does that only apply to the

murder one?" The court did not directly answer the question and told the jury to read the instructions carefully and to continue to deliberate.

¶ 14 The jury found defendant guilty of first degree murder. In reading the verdict, the trial judge indicated that the jury also found that defendant had personally discharged a firearm while committing the offense. The jury was polled, and each member affirmed that the verdict that the judge read was what they had found. However, it was uncovered shortly after the jury was dismissed that the jury had actually not found that defendant personally discharged a firearm while committing the offense. Defendant was left with a judgment on the verdict finding him guilty of first degree murder, but no firearm enhancement was applied. He was sentenced to 30 years in prison, and he now appeals.

¶ 15                                                    II. ANALYSIS
¶ 16                                          A. Question From the Jury
¶ 17 Defendant argues that the trial court erred when it refused to directly answer the jury's question about the firearm enhancement and how it related to the charge of second degree murder. Defendant maintains that the trial court's failure to alleviate the jury's confusion on the subject violated his right to due process.

¶ 18 As a general matter, jurors are entitled to have their questions answered. *People v. Clark*, 52 Ill. 2d 374, 391 (1972). The circuit court has a duty to instruct the jury where clarification is requested, the original instructions are incomplete, and the jurors are manifestly confused. *People v. Reid*, 136 Ill. 2d 27, 39 (1990). When the jurors ask the court to clarify the law, it is the duty of the court to answer their questions. *People v. Falls*, 387 Ill. App. 3d 533, 537 (2008).

¶ 19 Under some circumstances, however, the circuit court may exercise its discretion to refrain from answering a jury's question. *Reid*, 136 Ill. 2d at 39. The circuit court may decline to answer a jury's question if the jury instructions are readily understandable and they sufficiently explain the relevant law, where further instructions would serve no useful purpose, where further instructions would potentially mislead the jury, or where the jury's question involves a question of fact. *Id.* The circuit court may also refuse to answer an inquiry by a jury if an answer or an explanation by the court would cause the court to express an opinion on the evidence or would probably direct a verdict one way or the other. *Id.* The trial court's decision whether to answer and how to answer questions asked by jurors during deliberations will not be disturbed absent an abuse of discretion. *People v. Landwer*, 279 Ill. App. 3d 306, 314 (1996).

¶ 20 In this case, in a note to the judge, the jury asked "If we are to select the charge of second degree murder, do we still have to consider the additional gun charge or does that only apply to the murder one?" When the court reviewed the question with counsel present, the State argued that the court should not answer the question because the answer was already in the instructions given to the jury. Defense counsel argued that the court should answer the question and proposed that the court respond that "If you find second degree murder, you do not have to consider other charges." The court did not directly answer the question and told the jury to read the instructions carefully and to continue to deliberate.

¶ 21 Defendant contends that the pattern jury instructions, which are what was given in this case, are not sufficient when the jury's considerations include both second degree murder and

a firearm enhancement. Defendant argues that the court's refusal to directly answer the question and to instead refer the jury back to the instructions left the jury with no answer at all, even though, according to defendant, an answer to the question would have been simple, would have served a direct purpose, and would have been responsive to a question of law.

¶ 22　　When the jury was tasked with determining whether defendant was guilty of either first degree murder or second degree murder, the jury instructions given in this case directed the jury to consider three propositions: whether defendant caused McDowell's death, whether defendant had one of the requisite mental states, and whether defendant lacked justification for using the force that he used. The instructions tell the jury that if any of those propositions had not been proved beyond a reasonable doubt, their deliberations about first and second degree murder should end, and they should move to considering the elements of involuntary manslaughter. We know from the jury's question and from their ultimate verdict that they found each one of those propositions proved and moved to the next step of their deliberations on murder.

¶ 23　　The jury instructions regarding the murder charges provide that if the jury has found the three propositions outlined above to have been proved, then they should go on with their deliberations to "decide whether a mitigating factor has been proved so that the defendant is guilty of the lesser offense of second degree murder instead of first degree murder." The instructions go on to tell the jury that if they have found that defendant proved one of the mitigating factors, they should find defendant guilty of second degree murder, but if defendant did not prove one of the mitigating factors, they should find him guilty of first degree murder. The instructions make clear that if the jury was to find defendant guilty of the lesser offense of second degree murder, it would be doing so *instead* of finding him guilty of first degree murder.

¶ 24　　The instructions concerning the firearm enhancement direct the jury to consider the proposition for the firearm enhancement as "the allegation made in connection with the offense of first degree murder." The instructions state that "If you find the defendant is guilty of first degree murder, you should then go on with your deliberation to decide whether the State has proved beyond a reasonable doubt the allegation that during the commission of the offense of first degree murder the defendant personally discharged a firearm that proximately caused death to another person." The firearm enhancement proposition states that for the jury to find that the State has proved the enhancement it must find that "during the commission of the offense of first degree murder, the defendant personally discharged a firearm that proximately caused death to another person."

¶ 25　　The instructions make clear that the firearm enhancement is only to be considered in connection with the offense of first degree murder. In both the instructions and the verdict form related to the firearm enhancement, it is repeatedly made clear that the enhancement is to be considered in connection with the "first degree murder" charge only. There is nothing to suggest that the trial court's response to the jury's question—directing them to read the instructions carefully—did not solve the issue. A discerning reading of the instructions would have unambiguously answered the jury's question. Moreover, there is nothing to suggest that the jury had any confusion regarding the distinction between first degree murder and second degree murder. And ultimately the jury found that the allegation necessary to sustain the firearm enhancement was not proven. Any misunderstanding whether the firearm enhancement applied could not have prejudiced defendant.

¶ 26    Defendant contends that the question the jury asked illustrates that once the jury found the propositions necessary for first degree murder, "the jury did not know where to turn next" and "the path forward was decidedly unmarked." Defendant opines that the jury might have been confused about whether to contemplate the firearm enhancement before visiting the charge of second degree murder. But in the very same instruction in which the jury was to analyze the propositions related to first degree murder, it was instructed to continue onto the alleged mitigating factors to decide whether second degree murder would have been appropriate. "If you find each of [the first degree murder propositions] has been proved, your deliberations should continue as to the additional propositions regarding whether the defendant is guilty of second degree murder instead of first degree murder." There is nothing even mentioning the firearm enhancement that could logically support defendant's theory of confusion. The question was not about the instruction delineating the differences between first degree murder and second degree murder, it was about the firearm enhancement.

¶ 27    In addition, because the jury ultimately found that the enhancement was not proven, defendant has failed to articulate how the court's refusal to answer a question about it could be considered prejudicial. Whether the putative inconsistency in the verdict can stand is a separate question that we address below, but insofar as the jury's question is concerned, defendant has failed to show how he could have been prejudiced by the court not directly answering the jury's question. Defendant posits that "it is not inconceivable the jurors would have come to a different verdict, either of second degree murder or involuntary manslaughter" had they been properly instructed. But the question at issue did not ask anything about the differences between first degree murder and second degree murder, and involuntary manslaughter did not even come up.

¶ 28    There is no support for a hypothesis that the jury did not understand the instructions as they pertained to the difference between first degree murder and second degree murder. The question concerned the interplay between the firearm enhancement and the murder charge. Any answer that the trial judge might have given to the jury's question would not have spoken to the distinction between first degree and second degree murder such that we could infer that it might have found defendant guilty of second degree murder had the judge instructed the jury differently.

¶ 29    The trial court did not abuse its discretion when it decided not to directly answer the jury's question since the answer to the question was repeatedly and conspicuously expressed in the jury instructions. And defendant has failed to demonstrate prejudice because, even if the jurors were confused about the firearm enhancement, there is no suggestion that they were confused about what must be proved to support a guilty verdict of first degree murder as opposed to second degree murder.

¶ 30    B. Videotaped Prior Inconsistent Statements

¶ 31    Defendant argues that the trial court erred when it denied his request to use two clips from Marshawn Petty's videotaped police interview for purposes of impeachment or as substantive evidence. During Petty's videotaped interview, he told investigators that when the parties started to tussle, defendant pulled his arm away, and the gun "went off." Petty told investigators that McDowell had "lunged" at defendant and the gun was pointed downward when it went off. Petty also told investigators during the interview that defendant had the gun concealed

under his shirt as he approached McDowell and that he pulled out the gun in the middle of the tussle.

¶ 32    However, at trial, Petty testified that the gun was brandished all along and that defendant had the gun pointed at McDowell before any physical interaction between the individuals. Petty also testified at trial that McDowell tried to knock defendant off balance by hitting defendant's arm, but that McDowell himself lost balance, defendant yanked back and extended his arm, and shot one time. Defendant also argues that in the videotaped interview Petty gestured as to how the gun was held and that he should have been able to show the video to the jury for that purpose as well.

¶ 33    On cross-examination, defense counsel confronted Petty with the statements he had made during the interview. Petty admitted that he had made statements in the police interview that were not completely consistent with the testimony he had given at trial. Defense counsel made the jury aware that Petty had made inconsistent statements and informed the jury what those inconsistencies were. Defendant nonetheless contends that it was an abuse of discretion for the court to not allow him to play the video for the jurors to further demonstrate Petty's inconsistent statements. Defendant also argues that the statements should have been admitted as substantive evidence.

¶ 34    A party is not precluded from introducing a witness's prior inconsistent statements simply because the witness admits making those prior statements. *People v. Davis*, 254 Ill. App. 3d 651, 666 (1993). However, the trial court retains the ability to limit the scope of impeachment, and its exercise of discretion will not be overturned absent an abuse thereof. *Id.* Prior inconsistent statements can be admitted as substantive evidence when they meet the statutory requirements for admissibility. See 725 ILCS 5/115-10.1 (West 2016). Whether to admit a prior inconsistent statement as substantive evidence is left to the trial court's discretion. *People v. Harvey*, 366 Ill. App. 3d 910, 922 (2006).

¶ 35    In this case, whether for purposes of impeachment or as substantive evidence, the statements Petty made in the video interview would have added nothing to what was already adduced on cross-examination. Defense counsel introduced the statements that Petty made to investigators, and Petty admitted that he had made such statements and that he had been inconsistent. As to the statements made in the interview, the jury was given all of the information through live testimony that the video could have conveyed to them.

¶ 36    In addition, the statement Petty gave to the police is only perhaps minimally impeaching of his trial testimony and not on a significant issue. The putatively impeaching statement relates to questioning about *when* defendant pulled the gun. Where defendant was holding the gun or whether defendant pulled the gun before or after he and McDowell started to "tussle" is not crucial to the issue of whether the gun *was fired* because defendant was acting recklessly or because he intended to kill McDowell. The statements in the video did not lend any support to the defense's theory of the case. Defense counsel had the inconsistent statement, conveyed it to the jury, and had a full and fair opportunity to challenge the veracity of Petty's trial testimony. Little to nothing would have been gained by the trial court allowing the statements made in the video to be played for the jury. The trial court did not abuse its discretion when it declined defendant's request to introduce the compound and cumulative impeachment by playing the video.

¶ 37    In line with defendant's argument that the statements in the video should have been played for the jury, defendant argues that the video should have been admitted so that he could show

the jury how Petty physically demonstrated the events through gesturing in the police interview. In the videotaped interview, Petty can be seen demonstrating with his arms and hands what he saw happen on the day McDowell was killed. The video shows how Petty says defendant was holding the gun. But defendant does not explain how the gestures in the video were inconsistent with Petty's trial testimony. Even in the record now, it is unclear if the gestures made by defendant in the video interview are different than those made at trial or why they otherwise should have been admitted. Defendant did not sufficiently develop the record for that purpose, and defendant has failed to make a showing that the trial court abused its discretion by not letting defense counsel play the video for purposes of showing Petty's gestures.

¶ 38                              C. Other Crimes Evidence

¶ 39    Defendant argues that the trial court erred when it allowed Eric Washington to testify that defendant had pulled a gun on him shortly before McDowell was killed. Defendant argues that the testimony had the effect, and the State used it as such, of painting defendant as a violent person. Defendant argues that the testimony about defendant pulling a gun on Washington was so prejudicial that we should grant him a new trial. Defendant highlights the testimony about Washington stating that defendant was angry with him because he had not paid taxes for selling drugs in the area—illuminating for the jury that defendant was a drug dealer.

¶ 40    Evidence of other crimes may not be introduced in an attempt to show a defendant's bad character. *People v. Walston*, 386 Ill. App. 3d 598, 609-10 (2008). However, evidence of other crimes is admissible when it is relevant to a fact material to the prosecution. *People v. Robinson*, 391 Ill. App. 3d 822, 838 (2009). Other crimes evidence may be introduced against a defendant for the purpose of showing *modus operandi*, intent, identity, motive, absence of mistake, or for any purpose other than to show the propensity to commit crime. *Walston*, 386 Ill. App. 3d at 610. Other crimes evidence is admissible if it is part of a continuing narrative of the events giving rise to the offense and helps explain the circumstances of the crime. *People v. Carter*, 362 Ill. App. 3d 1180, 1189 (2005). A trial court must weigh the prejudicial effect of admitting the other crimes evidence against its probative value. *People v. Johnson*, 2014 IL App (2d) 121004, ¶ 47. The admissibility of other crimes evidence rests within the sound discretion of the trial court, and a reviewing court will not overturn its decision absent a clear abuse of discretion. *People v. Wilson*, 214 Ill. 2d 127, 136 (2005).

¶ 41    The testimony about defendant pulling a gun on Eric Washington or that it was about drug sales was not introduced in an attempt to show defendant's bad character. The evidence was necessary to explain to the jury why there was a confrontation between defendant and McDowell at all. Without the evidence regarding the genesis of the fatal confrontation, the narrative of events would have been disjointed and would not have illustrated to the jury why and how the events transpired. The evidence also needed to be introduced to allow the jury to consider any bias that Washington might have in his testimony and because the confrontation provided context into the parties' mindsets relevant to whether the killing was first degree murder, second degree murder, or involuntary manslaughter.

¶ 42    The confrontation between defendant and Washington was inextricably linked to the confrontation between defendant and McDowell. Without evidence of the confrontation between defendant and Washington, the jury could have been led to believe that McDowell was the unprovoked aggressor. As defendant acknowledges in his brief, the incident between

defendant and Washington was "pivotal to the narrative"—it was not offered for the purpose of portraying defendant as violent or for his propensity to commit crimes in general. There was nothing arbitrary or unreasonable about the admission of Washington's testimony about his confrontation with defendant, and the trial court did not abuse its discretion in letting the jury hear about that incident.

¶ 43                                    D. Sufficiency of the Evidence

¶ 44    Defendant argues that the evidence at trial was insufficient to prove that he committed first degree murder and that the evidence, at most, supported a finding of involuntary manslaughter. Defendant contends that the State failed to prove that he "knowingly or intentionally fired the gun" and instead that the evidence only showed that he might have acted recklessly when he "took a handgun and waved it at McDowell's face." According to defendant, "what the evidence has proved is that [he] committed involuntary manslaughter for recklessly waving a gun at McDowell before it went off."

¶ 45    When a defendant challenges the sufficiency of the evidence, we must decide whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *People v. Jones*, 219 Ill. 2d 1, 33 (2006). A reviewing court will not substitute its judgment for that of the jury and will not reverse a conviction for insufficient evidence unless the evidence admitted is so unreasonable, improbable, or unsatisfactory that it raises a reasonable doubt of defendant's guilt. *Id.* It is not the reviewing court's function to retry the defendant. *People v. Betance-Lopez*, 2015 IL App (2d) 130521, ¶ 40. The trier of fact assesses the credibility of the witnesses, determines the appropriate weight of the testimony, and resolves conflicts or inconsistencies in the evidence. *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 21. A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Betance-Lopez*, 2015 IL App (2d) 130521, ¶ 40.

¶ 46    Defendant makes clear that his challenge is to the evidence about the moments immediately preceding the shooting. Defendant argues that the witnesses' testimony about the events just before the shooting and the shooting itself fail to establish that he acted with the requisite intent to be guilty of first degree murder. The relevant portion of testimony for each witness begins when defendant left the porch, ran up to McDowell who had walked away, and confronted McDowell face-to-face across the street. Going witness by witness, defendant begins with the testimony of Emmanuel Barnett, so we will follow that model.

¶ 47    Barnett testified that when the parties were about three or four feet apart, defendant pointed the gun at McDowell's face. McDowell smacked at the gun, slapping defendant's hand, and the gun went off. Barnett clarified that the gun went off "as soon as [McDowell] touched [defendant's] hand, it seemed to" Barnett. Eric Washington testified that defendant and McDowell "tussled," there was a gunshot, and McDowell fell to the ground. Marshawn Petty testified that McDowell "lurched" at defendant and that they had a "little wrestle and tug." Petty testified that McDowell tried to grab the gun, that he lunged for it, and grabbed defendant's arm, but that defendant yanked it back and McDowell lost his balance and that was when the gun went off. Defendant emphasizes that two of the witnesses said that the gun "went off," rather than that defendant intentionally fired the weapon.

¶ 48    On the other side of the issue, the evidence showed that defendant was the aggressor in the ultimately fatal confrontation. McDowell had left the scene of their initial argument, and defendant pursued him. Each of the witnesses testified that only defendant was touching the weapon when it was fired. Barnett testified that he never saw McDowell grab defendant's arm, grab the gun, or touch the gun. Washington testified that McDowell never touched the gun. Petty testified that McDowell grabbed defendant's arm, but that defendant yanked his arm back before the shot was fired, and that McDowell's hands were off of defendant by the time the gun discharged. Petty's testimony spoke to a "moment of separation" as defendant acknowledged at oral argument. Petty said that defendant yanked back from the tussle, extended his arm, and shot one time, countering the narrative that the gun just went off. After the shooting, defendant fled. The police detective analyzed the gun and testified that it took at least eight and a half pounds of force to pull the trigger on the weapon used in this case.

¶ 49    Taking the evidence in a light most favorable to the State, a rational trier of fact could have found that defendant shot McDowell and that his actions were intentional, not reckless. There was no doubt that defendant pursued McDowell and pointed a gun at his face from a few feet away. While the testimony about what happened next could be interpreted in different ways, the jury interpreted it to be murder. That question was particularly in the province of the jury, which we must refrain from invading. See *People v. Jones*, 404 Ill. App. 3d 734, 744 (2010) (the question of whether a defendant acted intentionally, knowingly, or merely recklessly is a question to be resolved by the trier of fact). It is the duty of the jury to weigh the evidence, resolve inconsistencies, and make findings of fact, like the factual finding on a defendant's mental state. There was competing evidence on both sides, and the issue was particularly suited for the jury to decide. Defendant presented to the jury the same defense and arguments he presents here, and the jury rejected them. There is no reason for us to disturb the jury's factual finding in this case—there was ample evidence to support it.

¶ 50                        E. The Conviction and the Firearm Enhancement

¶ 51    The jury found defendant guilty of first degree murder for shooting and killing McDowell, but then, when presented with the firearm enhancement, found that the State had not proved that defendant personally discharged a firearm causing McDowell's death. Defendant argues that the jury's inconsistency cannot stand and, thus, that the verdict must be corrected to reflect that he was only guilty of involuntary manslaughter, not first degree murder.

¶ 52    As defendant acknowledges, we have addressed this issue before. In addressing the issue, we observed that "both the Illinois Supreme Court and the United States Supreme Court have stated that such an occurrence does not offend the constitution and such convictions can stand." *People v. Alexander*, 2017 IL App (1st) 142170, ¶ 38. Defendants cannot challenge convictions on the sole basis that they are legally inconsistent with acquittals on other charges. *People v. Jones*, 207 Ill. 2d 122, 133-34 (2003). And this proposition holds true when the challenge is to a special finding on the firearm enhancement. See *Alexander*, 2017 IL App (1st) 142170, ¶ 38.

¶ 53    Defendant argues that *Alexander* was wrongly decided. In *Alexander*, the court based its decision on Illinois Supreme Court and United States Supreme Court precedent holding that a defendant cannot challenge a conviction on the sole basis that he was acquitted on other charges. *Id.* ¶¶ 36-44. Defendant contends that "[b]ecause the firearm enhancement does not stand on its own as a separate count or charge and its viability is tied entirely to the first degree murder charge it accompanies, it cannot be severed from that same count the way separate

charges can be." Defendant contends that all the cases the court relied upon in *Alexander* were cases in which the defendant was convicted on some counts and acquitted on others and the courts in those cases said that the inconsistency could stand because each charge is independent and is to be considered a separate indictment. Defendant points out that the firearm enhancement, however, is not a separate charge and cannot stand independently.

¶ 54    The distinction made by defendant is well taken, but it does not direct a different result. Special interrogatories are specifically designed to test general verdicts. See *People v. Jackson*, 372 Ill. App. 3d 605, 610 (2007). The firearm enhancement does not serve that purpose. While special interrogatories are widely used in civil cases and provided for in the Code of Civil Procedure (735 ILCS 5/2-1108 (West 2016)), no directly parallel process is available in criminal cases. *Jackson*, 372 Ill. App. 3d at 612. The "use of special interrogatories in criminal cases is not favored." *Id.* Finding the firearm enhancement to be a criminal law parallel to a civil law special interrogatory as defendant essentially asks us to do, would be, in our view, an unwelcome development in criminal practice in Illinois. As in *Jackson*, "[w]e refuse to consider the answer to the 'special interrogatory' beyond the purpose for which it was asked— whether there could be a sentence enhancement." *Id.*

¶ 55    Moreover, as a practical matter, the inconsistency between jury findings that the Illinois and United States Supreme Courts have endorsed produces the same result as an inconsistency between the first degree murder conviction and a finding that the firearm enhancement was not proved. In *United States v. Powell*, 469 U.S. 57, 60 (1984), the jury found the defendant not guilty of conspiracy but guilty of using a telephone to commit the conspiracy. Logically, if there was no conspiracy, the defendant in *Powell* could not have been guilty of using a telephone to engage in the nonexistent conspiracy. But the Supreme Court held that the telephone conviction could stand. *Id.* at 69. Here, if defendant did not personally discharge the firearm causing death, then, under the circumstances in this case, he could not have committed first degree murder. But the discrepancy is legally indistinguishable from the situation presented in *Powell*. It makes no legal difference that the inconsistency is between a charge and an enhancement instead of a charge and another charge, even where one appears dependent on the other. Defendant is attempting to use the finding of not guilty in one aspect of his case to attack a guilty finding in another part of his case. Both Illinois and United States Supreme Court precedent forbid him from doing so. *Jones*, 207 Ill. 2d at 133-34.

¶ 56    As the United States Supreme Court anticipated, the jury in this case may have been convinced of defendant's guilt for first degree murder yet arrived at an inconsistent conclusion on the firearm enhancement for any number of reasons other than that he was not guilty, such as compromise or lenity. See *Powell*, 469 U.S. at 65. Courts must always be wary of invading the autonomy of the jury. Defendant asks us to find that the jury's negative finding on the firearm enhancement reflected its true intent on the case as a whole. But the jury did not make a finding indicating that defendant did not personally discharge the weapon. We cannot extrapolate from the jury's decision on the firearm enhancement that the jurors were "not convinced of the defendant's guilt" for first degree murder. See *id.* at 64-65. We decline to depart from *Alexander* or hold that it was wrongly decided.

¶ 57                                    III. CONCLUSION

¶ 58            Accordingly, we affirm.

¶ 59            Affirmed.

¶ 60            JUSTICE WALKER, specially concurring:

¶ 61            I agree that the panel has followed the law and concur with the judgment and opinion. In *People v. Jones*, 207 Ill. 2d 122, 133-34 (2003), a majority of our supreme court held that "defendants in Illinois can no longer challenge convictions on the sole basis that they are legally inconsistent with acquittals on other charges," following the United States Supreme Court's decision in *United States v. Powell*, 469 U.S. 57 (1984). Once the Illinois Supreme Court has declared the law, the lower courts in Illinois must follow it. *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 61.

¶ 62            I do not question my colleague's conclusion that this case is controlled by *Jones*. I do question, however, how it is that we, as judges, are directed to allow inconsistent verdicts to stand in criminal cases, where the standard is proof beyond a reasonable doubt, while we are also directed to strike down verdicts that are inconsistent with a jury's response to a special interrogatory in civil cases, where the standard is a mere preponderance of the evidence. See 735 ILCS 5/2-1108 (West 2012); *Simmons v. Garces*, 198 Ill. 2d 541, 555-56 (2002). While we are directed to rely on a special interrogatory as a "guardian of the integrity" of a civil verdict and strike a general verdict that is "irreconcilable" with a special interrogatory (internal quotation marks omitted) (*Simmons*, 198 Ill. 2d at 555-56), we allow for no such guardian in criminal cases.

¶ 63            When the jury in this case found that defendant did not personally discharge the gun that killed McDowell, the jury made a finding that cannot be reconciled with its guilty verdict on the charge of first degree murder. The first degree murder conviction required a finding that defendant knowingly or intentionally killed McDowell. See 720 ILCS 5/9-1 (West 2012). The record reflects that McDowell died of a single gunshot wound to the chest. The defense in this case was that defendant did not knowingly or intentionally fire the shot, but that the gun went off during a struggle. The jury's finding that defendant did not fire the gun is consistent with this defense but inconsistent with its finding that he intentionally killed McDowell.

¶ 64            Some of our sister states have declined to follow United States Supreme Court precedent and do not allow inconsistent jury verdicts to stand in criminal cases. See, *e.g.*, *People v. DeLee*, 969 N.Y.S.2d 350 (App. Div. 2013); *State v. Halstead*, 791 N.W.2d 805 (Iowa 2010); *Price v. State*, 949 A.2d 619, 630 (Md. 2008); *Brown v. State*, 959 So. 2d 218, 220 (Fla. 2007); *Hoskins v. State*, 563 N.E.2d 571, 577 (Ind. 1990); *DeSacia v. State*, 469 P.2d 369 (Alaska 1970). Commentators have also questioned whether it is consistent with due process to allow a criminal defendant to be convicted in the face of an inconsistent jury verdict. See, *e.g.*, Eric L. Muller, *The Hobgoblin of Little Minds? Our Foolish Law of Inconsistent Verdicts*, 111 Harv. L. Rev. 771, 800 (1998). As Professor Muller notes: "Thus, in the name of protecting the possibility that a jury has invoked its power to be lenient—a power which is at the periphery of the jury's function—the Court sacrifices the duty of reliable fact-finding, which is at the core of the jury's function." *Id.*

¶ 65    In *Jones*, our supreme court overruled its earlier decision in *People v. Klingenberg*, 172 Ill. 2d 270 (1996), which held that legally inconsistent verdicts cannot stand. *Jones*, 207 Ill. 2d at 136. Perhaps it is time to reexamine the issue. I am troubled by the current state of the law precluding a judge's ability to take action when a jury's core fact-finding function in a criminal case has seriously failed due to that jury rendering two verdicts that are simply incompatible.

¶ 66    PRESIDING JUSTICE MIKVA joins in this special concurrence.