2025 IL App (1st) 230049-U

No. 1-23-0049

Order filed May 23, 2025

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 19079 |
| | ) | |
| ANTHONY DAVIS, | ) | Honorable |
| | ) | Maria Kuriakos-Ciesil, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE TAILOR delivered the judgment of the court.
Justices Hyman and C.A. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction for intentional first degree murder where the State presented multiple witnesses who were corroborated by each other and the video evidence. We vacate defendant's conviction for strong probability first degree murder pursuant to the one-act, one-crime rule because it is based on the same murder as his conviction for intentional first degree murder.

¶ 2    Following a jury trial, defendant Anthony Davis was found guilty of two counts of first degree murder and received concurrent sentences of 45 years in prison for each count. On appeal, he asserts the evidence was insufficient to prove him guilty beyond a reasonable doubt, where the

State's evidence consisted of the testimony of three witnesses who were biased, impeached, and not credible. He also asserts, and the State concedes, that his two murder convictions concern the same act and thus violate the one-act, one-crime rule. We vacate his conviction for strong probability first degree murder (Count II) and order correction of the mittimus to reflect one conviction for intentional first degree murder (Count I). We otherwise affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Davis was charged by indictment with 24 counts of first degree murder while armed with a firearm (720 ILCS 5/9-1(a)(1), (2), (3) (West 2014)), including counts that he personally discharged the firearm that proximately caused the victim's death, 2 counts of aggravated kidnapping while armed with a firearm (720 ILCS 5/10-2(a)(6) (West 2014)), and 2 counts of aggravated unlawful restraint (720 ILCS 5/10-3.1(a) (West 2014)), premised on an incident in Chicago on September 20, 2014, in which Cortez Rivers was shot and killed.[1] Relevant here, Davis was ultimately convicted on both Count I, which alleged Davis committed intentional or knowing first degree murder (720 ILCS 5/9-1(a)(1) (West 2014)), and Count II, which alleged Davis shot and killed Cortez "knowing that such act created a strong probability of death or great bodily harm" (720 ILCS 5/9-1(a)(2) (West 2014)).

¶ 5     In 2018, Davis proceeded to a jury trial, which resulted in a mistrial due to a hung jury. Davis was re-tried before a jury in 2021.

¶ 6     At trial, Cortez's mother, Artise Carter, testified that, in September 2014, Cortez was 16 years old, of small build and a student at Manley High School in Chicago. Artise had separated

_____

[1] Because Cortez Rivers and his father Paul Rivers, who testified at trial, share the same last name, we refer to them by their first names.

from Cortez's father Paul in 2009. Cortez lived with Paul. Artise went to the hospital on September 20, 2014, where she learned that Cortez had died.

¶ 7    Bryan Stephenson testified that, in September 2014, he was 18 years old and a senior at Ombudsman High School in Chicago. Stephenson testified that he and Cortez were friends and were in the drug business together with Davis. Stephenson's position was to run the block, which meant that he was responsible for holding Davis's drugs and money. Stephenson made money holding Davis's crack-cocaine, heroin, and cash at his home, where he lived with his now-fiancée, Sierra Harper, and her family. Davis paid Stephenson to hold the stash. At that time, Stephenson had in his room a bag containing crack, heroine, and $500 in cash. Other people would sell the drugs for Davis, including Stephenson's friend Cortez. Davis was the "boss" of the operation. Stephenson only knew Davis as "Wayne" at that time and did not know his real name.

¶ 8    On the night of September 19, 2014, Stephenson got shot in the buttocks at a house party and went to the hospital with Harper. While at the hospital, Harper received a phone call from her father and then spoke with Stephenson. Stephenson learned that Cortez had entered their house without permission looking for clothes and took the "stash" of drugs and money. Stephenson called Davis because the drugs belonged to Davis. Stephenson testified that he was discharged from the hospital at 3 a.m. wearing his hospital gown and socks, and that a bullet was still lodged in his body.

¶ 9    At about 3 a.m., while Stephenson was waiting for a cab to go home, Davis and Keith Daro, who had the "same position" as Stephenson, arrived at the hospital. Davis was "mad" and saying, "I need my s***, mother-f***rs got me f***ed up trying to play me." Stephenson and Harper

entered the back seat of Davis's vehicle, with Davis driving and Daro in the front passenger seat. As Davis drove, he continued saying he needed his "s***" and someone was "going to get hurt."

¶ 10 Davis stopped the vehicle near a house at Wilcox Street and Pulaski Road. Davis exited the vehicle and approached Gregory McKinney, who was also known as "G-40," and two other people on the house's porch. Harper exited the vehicle, and then Stephenson exited as well after he heard arguing. McKinney told Davis that "we got to get down to the bottom of it" and handed Davis a black handgun. Harper denied that they had the "stuff," and stated, "[W]e didn't take it, we're not stupid, we're not lying to you." After they returned to Davis's vehicle, McKinney told Stephenson, "You got shot in your ass. You think that's something, I'll shoot you in your face." Stephenson was scared that Davis did not believe he was telling the truth about not taking the cash.

¶ 11 Davis then drove to Cortez's house near Quincy Street and Laramie Avenue. Davis and Stephenson exited the vehicle and walked to the door. Davis knocked on the door, but no one answered. Stephenson heard "something like a foot step," and Davis pointed his firearm at the peephole, and said, " 'Suck on this, b***.' " No one came to the door. They returned to the vehicle and dropped Daro off at his home. Davis told Stephenson to call Cortez again. Cortez answered and Stephenson put him on speaker-phone. Davis said to Cortez, "Where you at? Why are you playing with me? I was just at your house." Davis then drove Stephenson and Harper back to Cortez's house to pick up Cortez, who sat in the front passenger seat. Davis then drove Cortez, Stephenson and Harper to an alley near Wilcox and Kildare to retrieve the bag that had "the stuff" in it. Davis and Cortez got out of the car and returned with a brown bag. Davis handed the bag to Stephenson and asked if everything was there. Stephenson confirmed that the drugs were there, but the $500 in cash was missing. The cash had been in the bag when it was at his house.

Stephenson said Davis accused him and Cortez of "playing him" and Cortez repeatedly said, "I will not play you. You feed me. Why would I play you. You feed me."

¶ 12     Davis then drove them back to the house where McKinney had given Davis the firearm. Davis grabbed Cortez by the hair, pulled him out of the vehicle, and hit him in the head twice with his firearm. Davis then pulled Cortez down the gangway of the same building that "[McKinney] and them were at." Stephenson was "looking backwards" as they were "moving." Harper asked him if Cortez would be okay, and Stephenson stated "[h]e's just going to beat him up a little bit." Stephenson then heard two gunshots. He turned to his left and saw Cortez running past him toward Adams Street. Stephenson saw Davis aiming the firearm out in front of him. Stephenson did not know Cortez was shot at the time. Stephenson reached toward the driver's seat of the vehicle and took the keys because he was scared and wanted to ensure Davis could not drive away so that he would be caught.

¶ 13     Stephenson and Harper walked down Adams toward their house. Davis approached them on foot with the firearm still in his hand and stated, "I'm sorry. I thought that you did it. I tried to kill that little mother-f***er." Davis asked about the keys and Stephenson returned them, saying he was scared the police might come, which was a lie. Davis then gave Stephenson a "devil's hug," which Stephenson described as, "he put me in harm's way and he had me shaking up and all scared and why would you hug me." Stephenson did not try to call Cortez because his phone died. Harper did not call Cortez either. Stephenson testified that he did not call the police because he was scared, and said, "I just told my mom and his family what happened. I was just waiting."

¶ 14     Stephenson did not sleep and, in the morning, called Daro and told him to "get this s*** out my house" because Stephenson "want[ed] nothing to do with it." Daro came and took the stash.

Later that day Stephenson returned to the hospital because he was bleeding. Stephenson was in the hospital room next to Cortez and learned then that Cortez had died.

¶ 15     On September 26, 2014, Stephenson went to the police station, identified Davis and McKinney from a photograph, and gave a video statement. He confirmed that video surveillance footage from Adams Street showed Cortez running toward Jackson Boulevard, and Stephenson and Harper walking toward their house on Adams. Video surveillance footage also showed Stephenson leaving the hospital prior to the shooting and Davis in the garage area of Stephenson's house after the shooting. Stephenson confirmed that he was convicted of manufacturing and delivering cannabis "from" September 21, 2014.

¶ 16     On cross-examination, defense counsel asked Stephenson if he was a convicted felon for selling drugs. He stated, "No. I was on Jackson and Keeler buying a bag of weed and the police put the rest of [the] weed on me." When asked about the conviction that he acknowledged on direct examination, Stephenson stated, "Correct. I am a convicted felon, manufacturing with intent to deliver by a school." Stephenson also confirmed that he was "in trouble" due to Cortez taking the drugs and money. Both McKinney and Davis had firearms. McKinney had pointed a firearm at Stephenson and threatened to kill him.

¶ 17     Stephenson confirmed it was "up to [him]" to find Cortez. He confirmed that Cortez betrayed him and stole from the "organization." Cortez would be punished for it, but he was "supposed" to receive "a beat-up and that's it and pay it back later." Stephenson "was in trouble like a mother-f***" and was "really scared" for his life. He confirmed he was on crutches after being discharged from the hospital. Stephenson denied that he left the hospital because he had learned that the "stash house" had possibly been robbed, explaining that "the people in the hospital

said if [he] can stand up and walk [he] can go home." He testified that he was "basically kidnapped" because he was expecting to be driven home.

¶ 18    Stephenson confirmed with defense counsel that when he was walking down Adams Street, he was about 1½ blocks away from the "stash house." Counsel asked, "Your home is where you work?" Stephenson replied, "This mother-f***er." The court then removed the jury and instructed Stephenson not to talk to anyone "in that manner" and it could hold him in direct contempt for the response.

¶ 19    When defense counsel asked Stephenson if he spoke with Cortez's father Paul at the hospital when Cortez died, Stephenson answered, "I don't remember which person I spoke with but I told my mom what happened and I told her to tell his family." Stephenson testified that his mother "told" Cortez's family in the next room "while he was right there dead and while everybody was crying."

¶ 20    On redirect examination, Stephenson denied that he told Davis to shoot and kill Cortez, or that he wanted Cortez dead. He did not see the firearm discharge, but he saw Davis aim the firearm at Cortez and heard the gunshots.

¶ 21    Harper also testified regarding the incident. Harper was engaged to Stephenson and they had three children together. She testified that, while Stephenson was in the hospital, her father called her and then she called her sister, who told her that Cortez and his cousin came to the house, looked in her room, and took the drugs and money from under the bed in her room, which she shared with Stephenson. When she saw Davis at the hospital, he was acting angry and hitting a "machine thing that you put your card in."

¶ 22     When Davis first met up with McKinney, Davis said he "wanted his stuff and somebody is going to die tonight." McKinney told Davis to "investigate before you do anything." When Davis struck Cortez in the head with a firearm a second time, Harper turned her head and looked away from Cortez because she was scared "he was about to try to hurt him." She then heard two gunshots. She pulled Stephenson and his crutches out of the vehicle and they went toward their home. After the incident, on September 26, 2014, Harper went to the police station and identified Davis from photographs as the person who beat and shot Cortez. She signed her name next to Davis on the photo array.

¶ 23     Cortez's father, Paul Rivers, testified that on the night of September 19, 2014, he and Cortez were sleeping at home. Paul heard a knock at the front door, looked out the peephole, and saw a man standing in front of the door holding a firearm out in front of him. He could see the man's face. When asked if he saw the man in court, Paul testified he had a "picture" of him, but it was "quite a long time [ago]." When the State asked Paul to step down from the witness box to look around the courtroom, Paul did not make an in-court identification of the man who was holding the gun. Paul testified that he woke Cortez up. Cortez had looked at his phone, and Paul asked who was on the phone. Cortez stated Stephenson and "the other guy came with him," and Cortez was "just going with them." Cortez left the house, and Paul saw him in the courtyard with Stephenson and the "other guy." After Cortez left, Paul never saw him alive again.

¶ 24     When discussing the "other guy" who was with Stephenson, Paul confirmed that he recognized him, explaining he "was looking at him," but he "forgot his name because [it's] been a while." He confirmed he had seen the person through the peephole. Paul also stated, "He's kind of like light. [Stephenson] knows him. I really don't have to explain it really."

¶ 25    Paul testified that, the next day, he had received a text message that said "Wayne" with a photograph of a person he recognized as Davis. Paul also met with a detective that day and circled a photograph of Davis as the person he recognized holding the gun pointed at his peephole. When asked why he circled that person, Paul replied that "[t]hey said that's the one who did anything that happened to him." Paul stated, "That's when I looked through the peephole and then when I opened the door I'd seen them like this [demonstrating his right arm extended forward and made a fist]. Then I jumped back *** and shut the door." Paul confirmed that "he" had a firearm in his right hand.

¶ 26    Paul initially did not recall speaking with someone named Precious Lundy. On cross-examination, however, he identified the photograph that was texted to him and acknowledged that Lundy, who was trying to help him find out who shot his son, sent it to him. Paul then acknowledged that Lundy was Stephenson's cousin. Paul confirmed that she had a lot of details. Paul confirmed that he had a 2013 conviction for possession of a controlled substance.

¶ 27    Chicago police detective Jose Cardo testified that on September 20, 2014, he met with Paul and Lundy, who introduced herself as a "close family friend." Cardo learned the name of "Wayne" as a potential suspect, and learned the names of "G-40," Stephenson, and Harper. On September 21, Cardo showed Paul a photo array, which did not contain a photograph of Davis but included a photograph of McKinney. Paul did not make an identification. On September 25, Cardo again met with Paul, who showed Cardo a photograph on his phone with three people in it and identified the person on the left as the man who came to his door pointing a firearm through the peephole and left with Cortez. The photograph was entered into evidence. Cardo testified that Stephenson identified Davis as the person in the photograph who shot Cortez and that Stephenson signed the

photograph. Cardo also testified that Harper identified Davis as the person who hit Cortez with a firearm.

¶ 28    A forensic investigator testified that blood and a set of keys were observed in an alley north of Jackson Boulevard, Cortez's cellphone was recovered in a walkway in a vacant lot, and a blood trail was observed toward "the location of Wilcox." Photographs showed blood on the side façade of a building at the 4000 block of West Adams, near a fire hydrant in the vacant lot, in the vacant lot near an alley, and in the alley.

¶ 29    The State read into the record a stipulation that, if called, a medical examiner would testify that she examined Cortez. He was shot twice with a medium-caliber bullet and had gunshot wounds in his upper left arm, trunk, and upper left leg. The examiner would testify that Cortez died of multiple gunshot wounds, and the manner of death was homicide. The State further stipulated that Cortez was found unresponsive in an alley on the 4000 block of West Jackson, taken to the hospital, and pronounced dead in the emergency room.

¶ 30    Davis called Chicago police detective David Healey, who testified that he responded to the scene on the morning of September 20, 2014. At about 7:40 a.m., Paul approached him and said that Cortez had left the house between 3:10 and 3:30 a.m. with a "black male" of "medium build" named Ace. Paul did not mention having a firearm pointed at himself, or any firearm at all. While they spoke for about 10 or 15 minutes, Paul did not name an offender.

¶ 31    Davis entered by stipulation Stephenson's certified adult conviction for manufacture and delivery of cannabis within 1000 feet of school grounds on October 1, 2013. Following closing arguments, the jury received Illinois pattern jury instructions, inter alia, that included: 3.11 the

believability of a witness, 3.12 impeachment of a witness by prior conviction, 3.15 circumstances of identification, and 3.17 testimony of an accomplice.

¶ 32    The jury found Davis guilty of first degree murder, but found it was not proven that Davis personally discharged a firearm that proximately caused death to another person.

¶ 33    The report of proceedings reflects that, following a sentencing hearing, the trial court sentenced Davis, who was 37 years of age, to 45 years in prison for first degree murder without specifying the count(s). However, the mittimus in the common law record reflects that Davis was sentenced on two counts of first degree murder, Counts I (intentional) and II (strong probability), with each count receiving a concurrent sentence of 45 years.

¶ 34                                    II. ANALYSIS

¶ 35    On appeal, Davis argues that the State failed to prove him guilty of first degree murder beyond a reasonable doubt, where it relied on evidence submitted by witnesses who lacked credibility, had been impeached, and had an interest in testifying against him. Davis also argues that his mittimus erroneously reflects two convictions for first degree murder, in violation of the one-act, one-crime doctrine.

¶ 36                              A. Sufficiency Claim

¶ 37    When reviewing the sufficiency of the evidence at trial, our inquiry is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We will not retry the defendant when reviewing a challenge to the sufficiency of the evidence. *People v. Nere*, 2018 IL 122566, ¶ 69. Rather, it is the role of the trier of fact, here the

jury, "to determine the credibility of witnesses, to weigh their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence." *People v. Williams*, 193 Ill. 2d 306, 338 (2000). "Therefore, a reviewing court will not substitute its judgment for that of the trier of fact on issues involving \*\*\* the credibility of the witnesses." *People v. Brown*, 2013 IL 114196, ¶ 48.

¶ 38    The trier of fact need not "disregard inferences that flow normally from the evidence before it," or "search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 70. "The testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant." *People v. Gray*, 2017 IL 120958, ¶ 36. We "must allow all reasonable inferences from the record in favor of the prosecution" (*People v. Givens*, 237 Ill. 2d 311, 334 (2010)), and will not reverse a conviction unless the evidence is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Bradford*, 2016 IL 118674, ¶ 12.

¶ 39    Davis was found guilty of first degree murder under section 9-1(a)(1) of the Code, which provides that a person commits first degree murder when he or she kills an individual without justification and, in performing the acts which cause the death, "either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another. 720 ILCS 5/9-1(a)(1) (West 2014). Davis was convicted of first degree murder under both sections 9-1(a)(1) (intentional murder) and 9-1(a)(2) (strong probability murder) of the Code (720 ILCS 5/9-1(a)(1), (2) (West 2014)). As will be addressed later, this court agrees with the parties that we must vacate Davis's conviction under section 9-1(a)(2) strong probability murder

based on the one-act, one-crime rule. We therefore address only the sufficiency of the evidence to establish first degree murder under section 9-1(a)(1).

¶ 40     Here, Davis does not appear to dispute that he was present on the night of the incident. Rather, he asserts that the State's witnesses were not credible in testifying that he committed the murder. However, we find that the evidence at trial was sufficient to sustain Davis's conviction for first degree murder.

¶ 41     As a threshold matter, the jury's finding that the State failed to prove the enhancement that Davis personally discharged the firearm that proximately caused the victim's death does not affect our conclusion that Davis was properly convicted of first degree murder. As our supreme court has held, convictions cannot be challenged on the basis that they are legally inconsistent with acquittals on other charges. *People v. Jones*, 207 Ill. 2d 122, 133-35 (2003). Our supreme court recognized four main reasons that inconsistent verdicts are not a basis for reversal. First, inconsistent verdicts can often be explained as a product of juror lenity. *Id*. at 130. Second, when a jury returns an inconsistent verdict, we do not know whether the State or the defendant benefits, as " 'it is unclear whose ox has been gored.' " *Id.* (quoting *United States v. Powell,* 469 U.S. 57, 65 (1984)). Third, "the court was concerned with fashioning a rule that would allow only the defendant to challenge an inconsistent verdict" because "the government is precluded from challenging an acquittal[.]" *Id.* at 130-132. Finally, defendants can still challenge the sufficiency of the evidence for their conviction in cases of inconsistent verdicts. *Id.* at 131.

¶ 42     This court has previously affirmed a first degree murder conviction premised on the defendant shooting a victim despite the jury's finding that the State failed to prove the defendant personally discharged the firearm that caused the death, as there were "any number of reasons [for

the inconsistent verdicts] other than that he was not guilty, such as compromise or lenity." *People v. Ware*, 2019 IL App (1st) 160989, ¶ 56; see also *People v. Peoples*, 2015 IL App (1st) 121717, ¶¶ 102-03 (finding it "impossible to reconcile" the jury's guilty verdict on a first-degree murder count and its acquittal on a firearm enhancement yet nevertheless finding that the jury's "diametrically" inconsistent verdicts were not a ground for reversal). Thus, Davis's conviction for first degree murder may not be reversed based on the jury's finding that the State did not prove that he personally discharged the firearm that proximately caused Cortez's death. *But cf. Ware*, 2019 IL App (1st) 160989, ¶¶ 61-62 (Walker, C.A., J., specially concurring, joined by Mikva, J.) (agreeing we must follow our supreme court's precedent in *Jones*, but questioning "how it is that we, as judges, are directed to allow inconsistent verdicts to stand in criminal cases, where the standard is proof beyond a reasonable doubt, while we are also directed to strike down verdicts that are inconsistent with a jury's response to a special interrogatory in civil cases, where the standard is a mere preponderance of the evidence. [Citations.] While we are directed to rely on a special interrogatory as a 'guardian of the integrity' of a civil verdict and strike a general verdict that is 'irreconcilable' with a special interrogatory [citation], we allow for no such guardian in criminal cases.").

¶ 43    Turning to the merits of Davis's sufficiency claim, the State presented the testimony of both Stephenson and Harper, who testified regarding the events leading to the shooting. Their testimony established that while Stephenson was at a hospital after being shot, Stephenson and Harper learned that the victim Cortez had taken the "stash" from their house. Stephenson left the hospital on crutches and in his hospital gown. While waiting for a cab at the hospital, Davis approached Stephenson and Harper, and then they all left the hospital together in Davis's vehicle.

Davis retrieved a firearm from someone at another residence. Eventually, they picked up Cortez in Davis's vehicle. Davis stopped the vehicle and pulled Cortez out. Both Stephenson and Harper saw Davis hit Cortez in the head with a firearm twice, heard two gunshots, and saw Cortez running away. Stephenson saw Davis aiming the firearm out in front of him right after the two gunshots.

¶ 44   After the shooting, Stephenson and Harper observed Davis approach them at their house while still holding the firearm. They both testified to Davis's angry demeanor as the events unfolded and to his threats of physical harm. They also positively identified Davis as the shooter to a detective. The testimony of either Stephenson or Harper alone would have been sufficient to sustain Davis's conviction. See *Gray*, 2017 IL 120958, ¶ 36. Even if Stephenson and Harper were found to be accomplices to the murder, their testimony, "whether corroborated or uncorroborated," would be "sufficient to sustain a criminal conviction if it convinces the [trier of fact] of the defendant's guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Carrilalez*, 2012 IL App (1st) 102687, ¶ 32. Although Davis claims that Stephenson and Harper were not reliable witnesses, the jury here was convinced of the credibility of these State witnesses and of Davis's guilt. See *People v. Carrilalez*, 2012 IL App (1st) 102687, ¶ 32 ("[A] conviction will not be reversed simply because the defendant claims that a witness was not credible.") (Internal quotation marks omitted.)

¶ 45   Davis asserts that he could not have been found guilty because the State's witnesses had numerous credibility issues. He claims that Stephenson and Harper both had a motive to testify falsely against him. Stephenson was in trouble with Davis due to Cortez taking Davis's "stash," and so Stephenson had "just as much motive and opportunity to commit the crime and cover it up with a story that Davis was the actual shooter." Davis asserts Harper also had a motive to testify

falsely against him to protect her fiancé Stephenson, with whom she lived and had children. However, "[t]he presence of motive to lie does not render testimony unconvincing." *People v. Sullivan*, 366 Ill. App. 3d 770, 782 (2006). While the State's witnesses may have carried some concerns regarding their credibility, those concerns were presented to a jury that ultimately found Stephenson and Harper credible. We, as a reviewing court, cannot substitute our judgment for that of the jury on this issue. *Brown*, 2013 IL 114196, ¶ 48.

¶ 46    Although Davis asserts that the testimonies of Stephenson and Harper were "suspiciously similar," the fact that these two witnesses provided similar accounts only strengthened the State's case. Neither witness was significantly impeached as Davis claims, and any minor internal inconsistencies in their individual accounts did not compel the jury to find either witness not credible. See *People v. Howard*, 376 Ill. App. 3d 322, 329-30 (2007) (minor inconsistencies in the witnesses' testimonies did "not compel a finding that their testimony was not credible, given the consistency with which they testified to the essential elements of the offenses"). The jury was "free to resolve inconsistencies in testimony" and was "free to accept or reject as much or as little of" their testimony as it pleased. *Sullivan*, 366 Ill. App. 3d at 782. We cannot overturn Davis's conviction on the basis that we disagree with the jury's findings that Stephenson and Harper were credible, as Davis asks us to do.

¶ 47    Moreover, the State presented more than just the testimony of these two witnesses. It presented video evidence depicting Cortez, Stephenson, and Harper leaving the scene of the shooting, just as Stephenson and Harper testified. Photographs depict trails of blood on the path that Stephenson and Harper observed Cortez take away from the scene. Cortez's father, Paul, testified that he heard a knock at the door that night and saw a man aiming a firearm at the front

door's peephole. While Paul did not clearly identify Davis in court as the man who held a firearm to the peephole, Stephenson and Harper identified Davis as the shooter. Taking the State's evidence together as a whole, we cannot find that the evidence was "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Bradford*, 2016 IL 118674, ¶ 12.

¶ 48    While Davis points out that there was no physical evidence to prove that he was the shooter, such as fingerprints, gunshot residue, ballistics, or DNA, such evidence was not required to find him guilty. See *People v. Williams*, 182 Ill. 2d 171, 192 (1998) ("Proof of physical evidence connecting a defendant to a crime has never been required to establish guilt."). As such, we find that the evidence presented by the State was sufficient to prove Davis's guilt of first degree murder beyond a reasonable doubt.

¶ 49                           B. One-Act, One-Crime Doctrine

¶ 50    Davis also argues, and the State concedes, that his mittimus erroneously reflects two convictions for first degree murder, in violation of the one-act, one-crime doctrine.

¶ 51    Under the one-act, one-crime rule, "a criminal defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act." *People v. Coats*, 2018 IL 121926, ¶ 11. Where there is a violation of the one-act, one-crime doctrine, a "sentence should be imposed on the more serious offense and the less serious offense should be vacated." *People v. Artis*, 232 Ill. 2d 156, 170 (2009). We review *de novo* whether a violation of the one-act, one-crime rule occurred. *Coats*, 2018 IL 121926, ¶ 12.

¶ 52    Here, Davis's mittimus reflects two convictions for first degree murder based on two separate counts in his indictment: Count I, which charged intentional murder under section

9-1(a)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/9-1(a)(1) (West 2014)); and Count II, which charged murder based on acts which the defendant knows "create a strong probability of death or great bodily harm to that individual or another," as set forth in section 9-1(a)(2) (720 ILCS 5/9-1(a)(2) (West 2014)). We agree with the parties that Davis's two convictions concerned the same act, as they both concerned the shooting and killing of the same victim, Cortez. See *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 175 ("[W]here there is only one victim in a murder case, there can be but one conviction of murder." (Internal quotation marks omitted.)). Therefore, Davis could not have been convicted on both counts, as the two convictions violate the one-act, one-crime doctrine.

¶ 53    We also agree with the parties that Davis's Count I conviction for intentional murder is a more serious offense than the Count II conviction for strong probability murder. See *People v. Smith*, 233 Ill. 2d 1, 20-21 (2009) (where a defendant is charged with murder in multiple counts alleging intentional, knowing/strong probability, and felony murder, intentional murder is deemed the most serious). As such, we vacate Davis's sentence on Count II for strong probability first degree murder. *Artis*, 232 Ill. 2d at 170.

¶ 54    Pursuant to our authority under Illinois Supreme Court Rule 615(b)(1) (eff. Jan. 1, 1967), we order the clerk of the circuit court to correct the mittimus to reflect one sentence for first degree murder based on Count I, intentional murder under section 9-1(a)(1) of the Code. See *People v. Smith*, 2016 IL App (1st) 140039, ¶ 19 (the appellate court may correct the mittimus without remanding to the trial court).

¶ 55                                III. CONCLUSION

¶ 56    For the foregoing reasons, we vacate Davis's Count II conviction for strong probability first degree murder and order that the mittimus be corrected accordingly. We affirm the judgment of the trial court in all other respects.

¶ 57    Affirmed in part; vacated in part.