2021 IL App (1st) 180617-U

No. 1-18-0617

Order filed February 3, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 12806 |
| | ) | |
| CHARLES TERNOIR, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm defendant's conviction for first-degree murder over his contention that the trial court abused its discretion in admitting certain other crimes evidence.

¶ 2   Following a jury trial, defendant Charles Ternoir was found guilty of first-degree murder during which he personally discharged a firearm (720 ILCS 5/9-1(a)(1) (West 2016)) and sentenced to 70 years in prison. On appeal, defendant contends that the trial court erred in admitting

certain other crimes evidence that had no relevance to show his motive or intent to commit the offense. We affirm.

¶ 3    Defendant was charged with six counts of first-degree murder following the June 29, 2016 shooting death of Larry "Rico" Lawrence.

¶ 4    Prior to trial, the State filed a motion *in limine* seeking to admit other crimes evidence, specifically, that defendant and Lawrence both sold narcotics in the area of Clark Street and Division Street in Chicago. Defendant filed a response alleging that the proposed evidence was neither intrinsic to, nor part of, the continuing narrative of the case and arguing that although certain witnesses could testify that they knew defendant as a drug dealer, that knowledge was neither reliable nor substantiated by other facts. Defendant concluded that the prejudice of this evidence far outweighed its probative value.

¶ 5    At the hearing on the motion, the State explained that the fact that defendant and Lawrence were drug dealers on the same block was the motive for the offense. The trial court asked how this evidence would come before the jury, and the State replied through the testimony of witnesses who purchased drugs from both defendant and Lawrence. The trial court then asked whether the State expected these witnesses to testify that they knew defendant and Lawrence as drug dealers in the same location, and the State answered yes.

¶ 6    The defense stated that it had not been tendered any statements by witnesses Serita Woods or Michael Coleman stating they had purchased narcotics from defendant or Lawrence.[1] Moreover, "statements regarding buying narcotics [were] not in any of the reports tendered" to the defense.

---

[1] Serita Woods and another woman who was present at the shooting, Antoinette Woods, are not related. For clarity, each woman will be referred to by her first name.

Counsel further stated that Serita did not identify defendant by name, although she recognized defendant from seeing him in the area. According to counsel, "no evidence" tendered to the defense stated that "they observed" either Lawrence or defendant "selling drugs on any particular time and day," and therefore, there was no "direct observation" of narcotics sales.

¶ 7    The trial court concluded that this was a question of fact for the jury, and that defendant might be able to impeach by omission "down the line" by arguing that the witnesses "never said it before or police didn't write it down." However, the trial court stated that it could not stop the witnesses from testifying "in context how they know the people and how they are able to make identifications and giving some context as to what may have preceded any dispute or animus between the deceased and the defendant should there have been some." The trial court therefore found the other crimes evidence admissible. The matter proceeded to a jury trial.

¶ 8    Coleman testified that he was about to be released from prison after completing a sentence for retail theft and had two prior convictions for aggravated robbery. In 2016, he visited a CVS parking lot each day to purchase and use heroin, and to "hustle." On June 29, 2016, he used heroin in the afternoon, but was not impaired by 8 p.m. when he went to the parking lot with drugs to sell.

¶ 9    When Coleman arrived at the parking lot, he saw Lawrence and Serita, who both "hustle[d]" in the area. Coleman explained that "hustle" meant to sell drugs. He had known Lawrence for four years. Serita, whom he had known his entire life, was also a drug user. Coleman's girlfriend at the time, Antoinette Woods, was also present.

¶ 10    Coleman walked into the parking lot to make a narcotics transaction. At one point, a four-doored black vehicle arrived and a passenger exited. Coleman identified defendant, whom he referred to as "CJ," in court as the passenger. He knew defendant from "the neighborhood

hustling," that is, selling drugs. Coleman had known defendant for four or five months and saw him three to four times a week. Coleman purchased drugs from a "few" people at Clark and Division. He "might" have purchased drugs from defendant, but did not remember.

¶ 11    After speaking to a few people, defendant walked past Coleman and Antoinette, and onto Clark. There, defendant "encountered" Lawrence and "upped his gun." Coleman explained that "to up a gun" meant to "pull a gun somewhere from his waist." Coleman did not hear defendant say anything, but Lawrence said, "man, you up that motherf***, you got a blow that motherf***." Defendant then fired "a lot of times" at Lawrence. Lawrence, who did not have a firearm, ran across Clark, and collapsed in the southbound lane. As defendant turned to leave, Lawrence "hollered" that "you going to shoot me in front of everybody like this." Defendant stopped, turned around, and fired again. After more than 10 shots, defendant returned to the parking lot, dropped the firearm in a garbage can, and ran away.

¶ 12    Coleman spoke to police and identified defendant in a photographic array as the shooter. He was also shown a video of the shooting. At trial, Coleman identified himself, defendant, and Lawrence in photographic stills taken from the videos and in the videos. These videos were then published.

¶ 13    A video from the CVS parking lot shows defendant exit a black vehicle from the passenger side. Defendant, who has a hand in his pants or waistband, passes a woman in a hooded sweatshirt and walks out of the frame. The driver of the black vehicle also exits and stands near the vehicle. The woman interacts with Coleman, who then walks past the woman and out of the frame. After a few seconds, everyone scatters. Defendant reenters the parking lot, interacts with the driver of the

black vehicle, and then runs away. The driver of the black vehicle enters the vehicle and exits the parking lot going the opposite direction from defendant.

¶ 14    A video of the street outside the CVS parking lot shows defendant exit the parking lot and approach Lawrence, who is standing near the curb in the street. Coleman is also present. After defendant and Lawrence interact, defendant shoots him. As Lawrence staggers away, defendant follows with his arm outstretched and shoots again, including when Lawrence is on the ground. Defendant then goes back toward the CVS parking lot. Several people approach Lawrence, who is lying in the middle of the street. Coleman leaves.

¶ 15    During cross-examination, Coleman acknowledged that there were "a lot" of drug dealers around Clark and Division, and that he sold and used drugs. He then testified that Serita did not sell narcotics, but only used them. When trial counsel noted that Coleman testified on direct examination that Serita "was also out there hustling," Coleman clarified that "hustling" meant "[a]nything to get money," and explained that Serita panhandled and did other things. He did not know if he told the police how long he knew defendant before the shooting and did not think they asked that question. However, he admitted telling the grand jury that he knew defendant for five months. The police did not ask him if defendant dropped a firearm in a garbage can.

¶ 16    Serita, who acknowledged previous narcotics convictions, testified that she had an addiction to heroin and crack cocaine, but at the time of trial had been "clean" for 4½ months. Serita and Lawrence were close friends and referred to each other as "Auntie" and "nephew." Lawrence was one of many drug dealers in the area.

¶ 17    Around 8 p.m. on June 29, 2016, Serita was panhandling at Clark and Division when she saw Lawrence come around the corner. She had used heroin that afternoon but was not high at that

time. As they were speaking, a person approached and said, "you got to get the f*** down from there." Serita identified defendant in court as this person. While Lawrence responded, defendant drew a firearm. As Lawrence turned to run away, defendant shot him in the back. Lawrence tried to run again, but defendant shot him twice more and he fell to the ground. Defendant then "emptied" the firearm into Lawrence. Defendant went back into the parking lot "where he came from." Serita later spoke to police and identified defendant in a photographic array.

¶ 18    During cross-examination, Serita testified that Lawrence wanted to give her his phone number, as he would not be in the area anymore because "there were a lot of drug dealers that had problems with him."

¶ 19    Chastity Williams, who had two children with Lawrence, testified that she was on the phone with him about 8 p.m. and heard six gunshots. On cross-examination, she testified that she knew Lawrence had been in a fight with a drug dealer named "E-Dub" and that she had fought with E-Dub's girlfriend earlier in the week of the shooting. On redirect, Williams confirmed that she had seen E-Dub before and described him as being skinny with braids.

¶ 20    Orlando Verzannon testified that he was on bond, had a pending case at the time of trial, and had previous convictions for possession and delivery of a controlled substance. He denied knowing Lawrence or defendant. On June 29, 2016, he "might" have driven his vehicle into the CVS parking lot. The State asked the trial court to declare Verzannon a hostile witness, and the court agreed.

¶ 21    Verzannon denied knowing defendant as "B.D." Although Verzannon acknowledged parking in the CVS lot and "guess[ed]" there were other black vehicles, he did not know whether defendant was in one of those vehicles. He "guess[ed]" that he saw defendant exit the passenger

seat of another vehicle, and "assume[d]" that defendant walked around the corner of the CVS. Verzannon did not see Lawrence and denied knowing Lawrence as a drug dealer in the area. Although he did not see defendant with a firearm, he heard gunshots. Verzannon denied seeing defendant shoot at Lawrence, denied seeing defendant approach Lawrence where he had collapsed on a parked vehicle, denied seeing defendant shoot Lawrence several more times, denied seeing defendant return to the parking lot, and denied seeing defendant toss a firearm into a garbage can. He explained that either his view was blocked or he was not paying attention. Verzannon drove away and did not speak to officers that day.

¶ 22    Verzannon stated that he was later forced to speak to the police and make a video statement, which was "all coached." He did not consent to video or audio recording. He acknowledged making the video statement but disputed the veracity of its contents. When Verzannon viewed a photographic array, he put his initials next to a photograph and wrote "saw him shoot the other guy." He "assume[d]" that defendant was the subject of that photograph.

¶ 23    The State played the video statement, which is included in the record on appeal. Therein, Verzannon stated that he chose and consented to make a videotaped statement. He identified B.D. in a photographic array, and stated that he saw B.D. shoot Rico. Verzannon knew B.D. and Rico as drug dealers who sold crack cocaine in the same neighborhood. Verzannon also sold crack cocaine. Verzannon further stated that on the day of the shooting, he drove into the CVS parking lot, parked, and exited the vehicle. He then saw B.D. arrive in the CVS parking lot and "tried to say hi." B.D., who seemed "focused on something," went around the corner. Verzannon next saw Rico try to run, but B.D. "upped a gun" and shot Rico. Rico fell down. B.D. then stood over Rico and fired three more times. B.D. walked off, then turned back and shot Rico "some more." B.D.

threw the firearm into a garbage can in the CVS parking lot and left on foot. Verzannon did not initially speak to the police because he was afraid. However, when he saw Rico's children's faces, he knew he had to speak to the police.

¶ 24    During cross-examination, Verzannon testified that he did not speak to police on the day of the shooting because he did not see the shooter. He spoke to the police after he was pulled over in his girlfriend's vehicle, detained, and placed in a holding cell. After three or four hours in the cell, an officer entered and told Verzannon "to tell him what happened" or he would make Verzannon's life "a living hell" by towing the vehicle, charging Verzannon with a drug offense, and having Verzannon's girlfriend evicted. The officer knew the identity of the offender, showed Verzannon a cell phone photograph of the alleged offender, and "needed" more witnesses. He testified that he "guess[ed]" that the photograph was of defendant. Verzannon was told what to say and made the statement to avoid going to jail.

¶ 25    During redirect, Verzannon admitted that some of the details in the statement were true, including that he was present in the CVS parking lot, but that others, such as the shooter walking past him, were "coached."

¶ 26    Chicago police officer Peter Stevens testified that Verzannon was arrested on August 10, 2016, as part of a "narcotics roundup" following an undercover narcotics operation. During a subsequent conversation, Verzannon talked about an incident at the CVS on Clark and Division. After Stevens spoke with his superiors, a decision was made to release Verzannon without any charges and Stevens transported him to meet with detectives.

¶ 27    Assistant State's Attorney Dan Piwowarzyk testified that he spoke with Verzannon on the night of August 10, 2016, at a police station, and was present when Verzannon made a video

statement. He denied threatening or making a deal with Verzannon in order to obtain a statement. He did not tell Verzannon what to say and Verzannon made the statement voluntarily.

¶ 28    Chicago police detective Jorge Lopez testified that during the course of the investigation, he spoke with Verzannon, who was not under arrest at the time, and made no promises or threats in order to obtain Verzannon's statement.

¶ 29    Chicago police detective Abdalla Abuzanat testified that he responded to the shooting. He recovered a firearm from a garbage can, and nine fired cartridge casings and one bullet from the scene. The State entered a stipulation that a fired bullet recovered from Lawrence's body was fired from the firearm discovered in the garbage can.

¶ 30    Chicago police officer Matthew Savage, an evidence technician, testified that he did not find ridge impressions on the firearm or cartridges.

¶ 31    Chicago police officer Benny Pambuku testified that around 8:14 p.m. on June 29, 2016, he observed a vehicle matching the description of a vehicle that left the scene of a shooting. The vehicle double parked, and a person ran up and entered the vehicle through the passenger side. Pambuku and his partner curbed the vehicle and detained the occupants. Defendant and another man were inside the vehicle. Defendant did not match the initial description of the shooter and Pambuku only detained the men for 5 to 10 minutes. Pambuku documented the interaction with investigatory stop reports which contained both men's names. He gave a description of defendant to other officers. Although Pambuku later went to the address defendant gave during the stop, he did not locate defendant.

¶ 32    The State entered a stipulation that on July 1, 2016 Dr. Jon Gates, an assistant medical examiner, performed an autopsy on Lawrence which revealed gunshot wounds to the back, right

arm, abdomen, and left hand, and that in Gates's opinion Lawrence's death was due to multiple gunshot wounds and the manner of death was homicide.

¶ 33 The State presentenced evidence that defendant was arrested on July 22, 2016, following a traffic stop. The State admitted its exhibits into evidence and rested.

¶ 34 During the instruction conference, the defense objected to Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 3.14), that defendant had been involved in other crimes. The trial court found that there was sufficient evidence to give the instruction and to limit the jury's "taking of the evidence" to the issues of intent and motive only and not to consider that evidence for any other reason.

¶ 35 After the defense rested and closing arguments were presented, the trial court instructed the jury, in relevant part, that

"Evidence has been received that the defendant has been involved in an offense other than that charged in the indictment. This evidence has been received on the issue of defendant's intent and motive and may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in that offense and, if so, what weight should be given to this evidence on the issue of intent and motive."

¶ 36 The jury found defendant guilty of first-degree murder and that during the commission of the offense, he personally discharged a firearm that proximately caused another person's death.

¶ 37 Defendant filed a motion for a new trial alleging, in pertinent part, that he was not proven guilty beyond a reasonable doubt and that the trial court erred in granting the State's motion *in limine* to permit proof of other crimes, specifically, "drug dealing." The trial court denied the motion. After a hearing, the trial court sentenced defendant to 45 years in prison for first-degree

murder and to an additional 25 years because a firearm was used in the commission of the offense. Defendant filed a motion to reconsider sentence, which the trial court denied.

¶ 38     On appeal, defendant contends the trial court erred when it admitted other crimes evidence that he was a drug dealer when that evidence had no relevance to his motive or intent to commit the charged offense. He notes that no witness testified that there was a dispute between himself and Lawrence over the sale of drugs, and concludes that this prejudicial evidence could have affected the trial's outcome.

¶ 39     The State responds that the other crimes evidence was "highly relevant" to explain defendant's motive and intent for the shooting. The State further argues that defendant was not prejudiced because the jury received a limiting instruction.

¶ 40     To be admissible, evidence must be relevant for a proper purpose. See *People v. Lehman*, 5 Ill. 2d 337, 342-43 (1955). Evidence proving a defendant's propensity to commit crimes is not a proper purpose, and generally, it is excluded from criminal trials as it tends to be overly persuasive to a jury, which may " 'convict the defendant only because it feels he or she is a bad person deserving punishment.' " *People v. Ward*, 2011 IL 108690, ¶ 24 (quoting *People v. Lindgren*, 79 Ill. 2d 129, 137 (1980)). Other crimes evidence, however, may be relevant for any purpose other than to prove a defendant's propensity to commit crimes such as a defendant's intent, *modus operandi*, identity, motive, or absence of mistake. *People v. Pikes*, 2013 IL 115171, ¶ 11. Other crimes evidence is admissible if it is part of a continuing narrative of the events giving rise to the offense and helps to explain the circumstance of the offense. *People v. Ware*, 2019 IL App (1st) 160989, ¶ 40.

¶ 41    However, even in those cases where other crimes evidence is relevant for a proper purpose, it may be excluded if its probative value substantially outweighs its prejudicial effect. *Pikes*, 2013 IL 115171, ¶ 11. We review a trial court's decision to admit other crimes evidence for "a clear abuse of discretion." *People v. Wilson*, 214 Ill. 2d 127, 136 (2005). An abuse of discretion occurs if the trial court's determination is arbitrary, fanciful, or unreasonable, or if no reasonable person would take the view adopted by the trial court. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 42    Here, Coleman's testimony and Verzannon's video statement explaining that they knew defendant to be a drug dealer in the area was not introduced to show defendant's bad character. Rather, the evidence was necessary to explain to the jury the circumstances of the offense. *Ware*, 2019 IL (1st) 160989, ¶ 40 ("Other crimes evidence is admissible if it is part of a continuing narrative of the events giving rise to the offense and helps explain the circumstances of the crime."). Further context for the offense appeared in Serita's and Williams's testimony that Lawrence, who also sold drugs in the area, was being threatened by other drug dealers and was planning to leave the area, and Coleman's testimony that he had known Lawrence for four years but defendant for only four or five months. Without the context that defendant and Lawrence were both drug dealers in the same neighborhood, but defendant was a newer addition, there was no explanation for the confrontation between defendant and Lawrence and the shooting was otherwise unexplained. We therefore find no abuse of discretion in the admission of the fact that defendant was a drug dealer in the same area as Lawrence.

¶ 43    Moreover, even if the evidence that defendant was a drug dealer were improperly admitted, it was harmless beyond a reasonable doubt. The improper introduction of other crimes evidence is harmless error where the defendant is neither prejudiced nor denied a fair trial due to its admission.

*People v. Sims*, 2019 IL App (3d) 170417, ¶ 30. Moreover, even if the other crimes evidence is erroneously admitted, it is harmless when there is substantial evidence of the defendant's guilt. *Id*. Additionally, a jury instruction admonishing the jurors about the limited purpose for which they may use the other crimes evidence substantially reduces the prejudicial effect of the admission of the challenged evidence. *Id*. ¶ 31.

¶ 44    In the case at bar, Serita and Coleman both identified defendant as the shooter at trial. Although Verzannon testified at trial that the content of his videotaped statement was false, in that statement he identified defendant as the shooter. Additionally, the shooting was captured on videotape, admitted into evidence, and published at trial. Coleman identified himself, defendant, and Lawrence in the video. This video, which shows defendant shoot Lawrence multiple times, is consistent with Serita's and Coleman's testimony and Verzannon's statement.

¶ 45    Even if this court were to accept as true defendant's assertion that the other crimes evidence was erroneously admitted, the fact remains that three eyewitnesses stated that defendant approached Lawrence and shot him multiple times, including while he was on the ground. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) (the credible and positive testimony of a single witness is sufficient to convict); see also *People v. Lewis*, 165 Ill. 2d 305, 356 (1995) ("[a] single witness'[s] identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting positive identification"). Moreover, the State presented a videotape of the shooting which was consistent with those identifications and descriptions of the shooting and permitted the jury to observe the offense, and which provided substantial evidence of defendant's guilt. See *Sims*, 2019 IL App (3d) 170417, ¶ 30.

¶ 46    Finally, the trial court addressed any danger that the other crimes evidence might be improperly considered by the jury by giving a limiting instruction when instructing the jury. See *Illgen*, 145 Ill. 2d at 376 (when the trial court specifically instructed the jury as to how other crimes evidence could be considered, the instruction "limited and substantially reduced any prejudicial effect created by the admission" of the evidence). Thus, even if the evidence that defendant was a drug dealer were improperly admitted, its admission was harmless beyond a reasonable doubt. Accordingly, we affirm defendant's conviction for first-degree murder.

¶ 47    For the forgoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 48    Affirmed.