2026 IL App (1st) 241261-U

No. 1-24-1261

First Division
June 22, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15 CR 1285 |
| ARTHUR WALKER, | ) ) | Honorable James Linn, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's judgment is affirmed where (1) trial counsel was not ineffective for failing to impeach a witness with prior inconsistent statements, (2) the trial court did not commit plain error in failing to comply with Illinois Supreme Court Rule 431(b), and (3) the 40-year sentence imposed on defendant did not violate the proportionate penalties clause.

¶ 2    Following a jury trial, defendant-appellant, Arthur Walker[1], who was 22 years old at the time of the offense, was found guilty of first-degree murder (720 ILCS 5/9-1(a)(1)-(3) (West 2022)), as well as personally discharging a firearm during the commission of the offense (730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2022)), and sentenced to 40 years' imprisonment. On appeal, defendant argues that: (1) trial counsel provided ineffective assistance of counsel by failing to impeach a witness with prior inconsistent statements; (2) the trial court committed reversible error in failing to ensure that jurors would not hold defendant's decision not to testify against him; and (3) his 40-year sentence violates the proportionate penalties clause of the Illinois Constitution. For the reasons that follow, we affirm.

¶ 3                              I. BACKGROUND

¶ 4    Following a 2014 shooting that resulted in the death of Martrell Ross (Ross) and injury to Credell Bowdry (Bowdry), defendant, along with codefendants Deandre Hughes (Hughes), Javon Almond (Almond), and Bianca Young (Young), was charged by indictment with several counts of first-degree murder and attempted first-degree murder. Several of the first-degree murder counts alleged a 20-year gun enhancement for personally discharging a firearm.

¶ 5    On July 18, 2017, following jury selection, the case proceeded to trial.[2]

¶ 6                         A. State's Case in Chief

¶ 7    The State's case in chief consisted of 15 witnesses and more than 100 exhibits. We have summarized the most salient portions of the testimony of those witnesses whose testimony is most relevant to the issues raised here on appeal.

---

[1] The record reflects that defendant is also known as Lamarius Tatum.

[2] Defendant and co-defendant Hughes were tried together but in severed trials with separate juries. Young and Almond were tried in separate trials.

¶ 8                                    Jeanette Ross

¶ 9     Jeanette Ross (Jeanette), the victim's mother, testified as follows. On the day of the shooting, Jeanette received a phone call around 3:30 p.m. from her niece that her son Ross had been shot. Later, at the morgue, she identified her son's body and a photograph of him as he appeared before death.

¶ 10                                   Shawanda Blakes

¶ 11     Blakes testified as follows. On the night of August 2 into the early morning of August 3, 2014, Blakes went to Bodi Night Club (Bodi) with Ross, Bowdry, and two other individuals known as "Dee" and "Gutter," to celebrate Bowdry's birthday. The group arrived around midnight, obtained a VIP section in the basement, and spent the evening socializing, drinking, and dancing. Blakes consumed one drink that night.

¶ 12     At the end of the night, Bowdry, Dee, and Gutter left to retrieve their vehicle from the valet across the street, while Blakes and Ross remained inside briefly to finish their drinks. When they exited the club, Blakes leaned against a white car parked in front of Bodi because her feet were hurting. At that point, a woman Blakes described as "caramel-skinned" with a "blonde weave," later identified as Young, exited the club and began yelling at her to get off the car. Blakes did not respond, but Ross told the woman to "stop talking" and "move around," which escalated the verbal exchange.

¶ 13     Shortly thereafter, a tall, dark-skinned man wearing a cheetah-print shirt, whom Blakes identified in court as defendant, came out of the club and approached Young. After Young said something to defendant, defendant became agitated and immediately attempted to fight Ross. Defendant and Ross then engaged in a physical altercation, during which Ross was knocked to the ground. Bodi security personnel intervened and broke up the fight.

¶ 14    Following this altercation, defendant and Young entered the white car and drove away. Blakes, Ross, Bowdry, and the others then crossed the street to the valet lot to wait for their vehicle. Another individual, whom Blakes identified in court as Hughes, who had remained behind, subsequently approached their group and asked what had happened. Someone in the group explained that defendant had been arguing with Ross. Hughes then used his phone and repeatedly said "busta-u." Blakes did not know to whom Hughes was speaking or what "busta-u" meant.

¶ 15    Shortly thereafter, the white car returned. Defendant exited the white car and again approached Ross, asking if he was ready to fight. Defendant appeared to be encouraging another confrontation and began "bouncing" and moving backward toward the rear of the valet lot and alley area, while directing Ross to follow him. Ross agreed and followed defendant into the lot.

¶ 16    Once defendant led Ross into the alley area and "got him where he wanted him," defendant lifted his shirt, produced a firearm, and fired at Ross from close range. Blakes saw defendant shoot Ross but did not recall how many shots were fired because she was "going crazy." Ross then fell to the ground.

¶ 17    Bowdry ran toward Ross to help him. At that point, an individual, whom Blakes identified as Hughes, came up behind Bowdry, struck him with a firearm, and then shot him multiple times. Blakes ran toward Bowdry, grabbed him, and helped move him toward the front of the lot. Bowdry was later transported by ambulance to Northwestern Hospital.

¶ 18    The following day, while still at Northwestern Hospital, Blakes identified defendant in a photo array as the person who shot Ross; Hughes as the person who shot Bowdry; and Young as the woman who initiated the confrontation.

¶ 19    On cross-examination, Blakes acknowledged that many people were outside the club and that a crowd followed into the valet lot area. She was approximately 20 feet away when defendant

shot Ross, and there were people between her and Ross at that time. She also acknowledged that she later discussed the incident with Bowdry prior to viewing the lineups. Blakes maintained, however, that she personally observed defendant shoot Ross.

¶ 20                                    Credell Bowdry

¶ 21    Bowdry testified that while at Bodi's he consumed only a small amount of alcohol and was not intoxicated. The remainder of his testimony was largely consistent with Blake's. According to Bowdry, when the white car returned to the area, he observed a short, heavyset individual, whom he identified as Hughes, approach the vehicle and reach into the back seat. Bowdry had seen Hughes earlier inside the club but had no interaction with him. After Hughes approached the white car, defendant, Young, and an individual in a blue jacket, later identified as Almond, exited the car.

¶ 22    Defendant then approached Ross again and began moving toward the rear of the valet lot and the alley area, gesturing for Ross to follow. Ross agreed and followed defendant. Bowdry followed them into the alley, which he described as somewhat removed from the larger crowd. Once in the alley, Ross and defendant approached each other and appeared ready to fight when defendant suddenly pulled out a firearm and fired three to four shots at Ross. At the time, Bowdry was approximately 10 to 12 feet away.

¶ 23    Bowdry immediately ran toward Ross to assist him. As he approached, he was struck in the mouth or head with a firearm, which caused him to turn. Bowdry was then shot by Hughes multiple times. Before collapsing, Bowdry was moved toward the front of the valet lot and subsequently transported by ambulance to Northwestern Hospital for treatment.

¶ 24    While at the hospital, Bowdry was shown photo arrays. He identified defendant as the person who shot Ross and Hughes as the person who shot him. He signed the advisory forms and

the identity photographs. Bowdry later identified defendant and Hughes again in separate lineups at the police station and also identified Young as the driver of the white car. Bowdry additionally identified defendant, Hughes, and Young in surveillance video and photographs shown at trial.

¶ 25                                              Aaron Little

¶ 26      Aaron Little, who was employed as a security guard at Bodi on the night of the shooting, testified as follows. On the night of the shooting, he was stationed at the front door of the club. As the club was letting out, he observed the beginning of a disturbance outside, involving a verbal exchange related to someone leaning on a car. The situation escalated and moved into the street, where multiple individuals began fighting, prompting security staff, including himself, to intervene and break up the altercation.

¶ 27      Little grabbed one of the individuals involved in the fight, whom he described as wearing a cheetah-print shirt. He also observed another individual wearing a plaid shirt and a woman with light-colored hair. After security broke up the altercation, he directed the parties to leave. The individual in the cheetah-print shirt, along with the woman and another individual, entered a white car parked in front of the club and drove away.

¶ 28      Shortly thereafter, while he was directing traffic in front of the club, Little observed the same white car return and make a U-turn. The vehicle nearly struck him as it pulled back toward the valet stand. Little found the vehicle's return unusual and concerning, given the earlier altercation. When the car stopped near the valet area, the individual wearing the cheetah-print shirt exited the vehicle and quickly moved toward the rear of the valet lot, holding his waistband. Little described the individual's movement as a "stuttered step" as he ran toward the alley.

¶ 29      Soon after the individual ran toward the alley, Little heard gunshots. Little did not see who fired the shots because he remained near the front of the club, away from the alley. Little described

the sounds of the shooting as occurring in three separate groups. He further stated that, based on his familiarity with firearms, the shots sounded like they came from different weapons. Upon hearing the gunfire, Little moved away from the area and sought cover.

¶ 30    Further, on direct examination, the State questioned Little regarding a written statement he reviewed and signed in December 2014. In the statement, Little stated that he had seen the individual in the cheetah-print shirt pull out a gun and shoot another individual. Little acknowledged signing the written statement but testified that he did not recall stating that he saw the shooter.

¶ 31    On cross-examination, Little testified that the written statement had been prepared by an assistant State's Attorney several months after the incident and that he was tired when he reviewed it. Little attempted to correct the statement because it inaccurately indicated that he saw the shooter with a gun. He stated that he later clarified during his grand jury testimony that he did not see the shooting or the shooter with a firearm because he was too far away from the alley where the shooting occurred.

¶ 32    On redirect examination, Little acknowledged that he was allowed to review the statement before signing it. He maintained that at the time, there were portions he wanted to change. On recross-examination, Little confirmed that his prior statement to the Assistant State's Attorney was not made under oath.

¶ 33                                    Brian Story

¶ 34    Brian Story, also a security guard for Bodi, testified regarding the initial altercation. His testimony was largely consistent with Little's. According to Story, after the initial altercation was broken up, he observed the individuals associated with the white car leave the area. About 3 minutes later, the same vehicle returned and stopped near the valet lot. The individual wearing the

cheetah-print shirt exited the vehicle and ran through the crowd toward the rear of the valet lot. Story and other security personnel then chased him through the lot.

¶ 35 Story was only a few feet away when the shooting occurred. He observed the individual in the cheetah-print shirt fire approximately three shots, after which a man in a "red shirt" fell to the ground. Story further observed the individual in the cheetah-print shirt flee down the alley.

¶ 36 Story further testified that, a few seconds after the initial shots, a second individual wearing a blue and black shirt approached and fired an additional three to four shots at Ross while he was on the ground. According to Story, this second individual then fled in the same direction as the first. Story subsequently heard additional gunshots coming from the same direction but did not see who fired those shots or who may have been struck.

¶ 37 At trial, Story identified defendant as the individual wearing the cheetah-print shirt and Young as the woman with blonde hair based on photographs taken inside the club that night.

¶ 38 On cross-examination, Story stated that he spoke with a detective on the night of the incident but denied telling detectives that he was unable to identify anyone involved due to poor visibility. He maintained that he was able to observe the events and identify the individuals involved.

¶ 39 On redirect examination, Story reiterated that he was not shown a photo array by police but recognized defendant from photographs taken inside the club. Story maintained that he informed police on the night of the incident that he recognized one of the individuals involved, but that he was not contacted again prior to trial.

¶ 40                                  Henry Franco

¶ 41 Franco, another security guard for Bodi, gave testimony that was largely consistent with Little's and Story's. Franco testified that after the initial confrontation, the individuals involved

entered a white car and drove away. He stated that approximately 30 seconds later, the same vehicle returned to the area near the valet lot. When the car returned, two individuals exited and ran through the valet lot, including the individual wearing the cheetah-print shirt, whom Franco identified as defendant.

¶ 42    From a distance of approximately 50 feet, Franco observed defendant pull out a firearm and begin firing in the direction of a group of people. Franco saw defendant discharge the weapon multiple times, but did not see the specific individual who was struck or observe that anyone had fallen. Franco stated that there was no one standing between him and defendant when he witnessed the shooting.

¶ 43    In December 2014, Franco viewed a lineup at the police station but was unable to identify any individual involved in the incident.

¶ 44    On cross-examination, Franco testified that there were approximately 40 to 50 people present in the valet lot area when the white car returned. Franco followed defendant into the lot and observed him running with his hands near his waistband before producing a firearm. Franco reiterated that he saw defendant fire the weapon, but did not see the victim or the impact of the shots. He also confirmed that he heard multiple sets of gunfire after the initial shots.

¶ 45                          Thor Martin

¶ 46    Assistant State's Attorney Thor Martin testified that on December 22, 2014, he met with Little at the police station and conducted an interview regarding the events of August 3, 2014. He explained that after speaking with Little about the incident, he offered him options for memorializing his statement, including a video recording or a written statement. Little chose to provide a typewritten statement. In preparing the statement, Martin asked Little questions and typed his responses on a laptop. Martin explained that the statement was not taken verbatim but

reflected a summary of Little's answers, including descriptions used to distinguish individuals by clothing, such as a person wearing a leopard-print shirt, a person wearing a plaid shirt, and a woman with chrome-colored hair.

¶ 47    After completing the written statement, Martin printed the document and reviewed it in its entirety with Little. He stated that he read the statement aloud while following along with the text and instructed Little to identify any errors, omissions, or changes he wished to make. Both Martin and Little made and initialed any corrections to the document, and Little signed each page to indicate that the statement was accurate.

¶ 48    The final portion of the statement included language indicating that Little could read and write English, had reviewed the statement, was allowed to make corrections, and affirmed that the contents were true and accurate. Martin stated that this concluding paragraph was generated after the initial review and was also reviewed and signed by Little.

¶ 49    The statement included photographic exhibits, and during the statement process, Little identified individuals depicted in one of the photographs. According to Martin, Little identified one individual as the person wearing the leopard-print shirt who fired the gun and identified another individual as the driver of the white vehicle with chrome-colored hair.

¶ 50    When questioned about a specific portion of the statement indicating that Little saw the individual in the leopard-print shirt pull out a gun and shoot at a person wearing a red plaid shirt, Martin testified that the statement reflected a summary of what Little had told him during the interview. During the review process, Little did not indicate that this portion of the statement was inaccurate or request that it be changed. Little indicated his agreement with the statement's contents by signing each page. At no point during the preparation or review of the statement did Little request any change that Martin refused to make.

¶ 51                                    Bianca Young

¶ 52    Young testified that she was present at Bodi on the night of the incident with defendant, Hughes, and Almond. Following the initial altercation, she entered the white car with defendant and Almond and drove away from the area. Hughes did not enter the vehicle at that time and remained behind. Young later returned to the area to pick up Hughes.

¶ 53    When Young returned, she stopped near the valet lot but did not immediately park. While still in the vehicle, she observed Almond retrieve a firearm from the back seat and saw defendant retrieve a firearm from the glove compartment. Young saw defendant with the firearm, but did not observe him immediately use it. When confronted with a prior recorded statement in which she indicated that defendant had "clicked" the gun, Young did not recall that detail but acknowledged that the recording reflected that statement.

¶ 54    Defendant exited the vehicle and ran toward the rear of the lot. Young initially ran with them but stopped after a short distance and returned to the car. She did not follow them into the alley and did not see where they went. Once back in the vehicle, Young heard gunshots, but she did not see who fired the shots or observe the shooting itself. Young later saw defendant walking down the street, at which point he entered the vehicle with her. She drove to a gas station, where Hughes later approached them.

¶ 55    Young acknowledged that, following her arrest, she was held in custody and had conversations with Hughes while at the police station. She also acknowledged that, in a recorded conversation, she stated that defendant, whom she referred to as "Junior," told her to "busta-u" and return to the scene. At trial, however, Young testified that no one in the car received a phone call instructing them to return, and that they returned to pick up Hughes.

¶ 56    On cross-examination, Young admitted that she had been drinking that night and described herself as intoxicated when she left the club. She maintained that she was not looking for a fight and that the initial confrontation began when she told individuals to get off the car.

¶ 57                                Brian Smith

¶ 58    Smith, a Chicago police forensic investigator, testified that he was assigned to process the scene of the shooting on August 3, 2014, at multiple locations along North Orleans and West Chestnut. He explained that, after coordinating with detectives and conducting a walkthrough, he documented the scene through video and photographs before collecting evidence. Smith observed the deceased victim, Ross, in an alley near 866 North Orleans, along with blood, cash, and numerous cartridge casings. He recovered and documented various items of physical evidence, including fired bullets, multiple .45-caliber and .40-caliber cartridge casings in the alley, and 9-millimeter casings associated with a police officer's weapon at 832 North Orleans. Smith stated that the presence of different calibers indicated that at least two firearms were discharged at the scene. Smith also recovered a .45-caliber firearm near 361 North Orleans in the Le Cordon Bleu parking lot and a blue jacket from the street.

¶ 59                        Dr. Kristin Escobar Alvarenga

¶ 60    Dr. Kristin Escobar Alvarenga, an assistant medical examiner, testified that she performed the autopsy on Ross. She documented eight gunshot wounds, including wounds to Ross's chest, abdomen, buttock, thigh, and leg, and recovered bullets from his body. Dr. Alvarenga concluded that Ross died from multiple gunshot wounds and that the manner of death was homicide.

¶ 61                        Detective Frank Szwedo

¶ 62    Detective Szwedo testified that, after reviewing photographs and surveillance footage from Bodi, detectives identified defendant, Hughes, Young, and Almond based on their clothing and

hairstyles. Later that same day, Szwedo and his partner separately administered photo arrays to Blakes and Bowdry at Northwestern Hospital after giving standard advisory instructions. According to Szwedo, Blakes identified defendant as the person who shot Ross and Hughes as the person who shot Bowdry. Bowdry separately identified Hughes as the person who shot him, and defendant as the person who shot Ross. Each witness signed and dated the identifications and stated that the two did not communicate with one another before viewing the arrays.

¶ 63                              Detective Carol Maresso

¶ 64    Detective Maresso testified that the investigation continued through the fall of 2014. She stated that Young, Hughes, and Almond were taken into custody on August 23, 2014, and that defendant was taken into custody after an arrest warrant was issued on September 2, 2014. Maresso also testified that Little, the security guard, later viewed a lineup and identified defendant as the person involved in the fight with Ross and as the person who shot Ross. On cross-examination, Maresso acknowledged that she was present during the lineup but did not assemble it herself and could not recall all of its details.

¶ 65                                 Fred Tomasek

¶ 66    Tomasek, a forensic scientist with the Illinois State Police specializing in firearm and tool mark identification, testified as an expert in firearms analysis. Tomasek received and analyzed multiple items of evidence in this case, including a Colt .45-caliber semiautomatic handgun, fired cartridge casings, fired bullets, and metal fragments. After testing the firearm for operability, he conducted test firings and compared those test shots to the recovered evidence. He concluded that several .45-caliber cartridge casings and two fired bullets recovered from the scene were fired from the submitted Colt .45 firearm. He also examined two .40-caliber cartridge casings and determined that they were fired from the same firearm, although no .40-caliber weapon was recovered for

comparison. Additionally, Tomasek analyzed a 9-millimeter handgun identified as a police officer's weapon and concluded that eight 9-millimeter cartridge cases were fired from that firearm.

¶ 67   Based on these findings, Tomasek concluded that the physical evidence reflected the use of at least two different firearms at the scene, including the .45-caliber firearm linked to the recovered evidence and a separate .40-caliber firearm for which no weapon was recovered.

¶ 68   Following Tomasek's testimony, the State rested.

¶ 69                          B. Defendant's Case in Chief

¶ 70   Defendant presented no live testimony but offered into evidence a joint stipulation concerning a conversation between Sergeant Daniel Gallagher and Brian Story. According to the stipulation, if called, Gallagher would testify that on the morning of August 3, 2014, he interviewed Brian Story about the shooting. Story indicated to Gallagher that he could not identify the shooter.

¶ 71   Following the stipulation, the defense rested. Defendant's subsequent motion for directed verdict was denied.

¶ 72                          C. Jury Deliberations and Post Trial Motions

¶ 73   Following closing arguments, the jury was instructed on the law and recessed to deliberate. The jury found defendant not guilty of attempted first-degree murder of Bowdry and found defendant guilty of first-degree murder of Ross. It additionally found that defendant discharged a firearm during the commission of the murder.

¶ 74   On August 31, 2017, defendant's assigned public defender requested leave to withdraw his appearance on defendant's behalf, and defendant's new counsel was granted leave to file an appearance on defendant's behalf.

¶ 75    On October 8, 2019, defendant's counsel filed a motion for a new trial, which, following argument, the trial court denied. On November 7, 2019, counsel filed a supplemental motion for a new trial and on August 18, 2021, counsel filed an amended motion for a new trial. Within these motions, defendant argued, *inter alia*, that defendant's trial counsel was ineffective for failing to impeach Young with prior inconsistent statements. Included as an exhibit was Young's interview with the police. Defendant's motion for a new trial was denied.

¶ 76                                    D. Sentencing

¶ 77    On May 5, 2022, the trial court conducted defendant's sentencing hearing. The parties agreed that the applicable sentencing range for first-degree murder, with the mandatory firearm enhancement, was 40 to 80 years' imprisonment. However, defendant argued that the range violated the proportionate penalties clause.

¶ 78    Defendant argued that, because he was found to have personally discharged a firearm, he was subject to a mandatory minimum sentence of 40 years' imprisonment, which he contended amounted to a *de facto* life sentence. He maintained that, although he was 22 years old at the time of the offense, the principles underlying juvenile sentencing should apply, and that the trial court should consider the facts of the offense, his personal history, and his development, and whether the application of the firearm enhancement violated the proportionate penalties clause.

¶ 79    The trial court rejected defendant's argument, noting that existing case law had applied such protections primarily to juveniles and that no authority extended those principles to a 22-year-old offender under the circumstances presented. The court acknowledged its general concerns regarding mandatory minimum sentencing schemes and the limitations they impose on judicial discretion, but found that, in this case, defendant was an actual shooter in a murder and that the statutory sentencing range did not shock the conscience of the community. The court further

expressed uncertainty as to whether the minimum sentence constituted a *de facto* life sentence and ultimately concluded that the sentencing scheme was not unconstitutional as applied to defendant.

¶ 80    In aggravation, the State presented a victim impact statement from Ross's mother, Jeanette, who described the profound emotional and financial impact of her son's death on her family and requested that the court impose the maximum sentence. Additionally, the State asked the court to consider a pending mob action incident involving defendant while in custody, proffering that defendant and others attacked another detainee and had to be physically restrained by correctional officers.

¶ 81    The State further argued that defendant's conduct warranted a sentence above the minimum based on the seriousness and circumstances of the offense. The State emphasized that defendant was found guilty of first-degree murder and that the jury determined he personally discharged a firearm, resulting in the victim, Ross, suffering fatal gunshot wounds. The State maintained that defendant's conduct did not merit the minimum sentence and requested that the court impose a more severe term.

¶ 82    In mitigation, defendant presented testimony from his mother, Tracy Walker, who described defendant's upbringing and personal development. She testified that defendant struggled with learning disabilities from a young age, was diagnosed with ADHD, and was placed in special education classes, which caused him embarrassment and emotional distress. She further explained that defendant's childhood was marked by family instability, including his parents' divorce, substance abuse in the home, and exposure to domestic violence, all of which negatively affected his emotional development. Defendant's mother further testified that, during his incarceration, defendant had matured, become more responsible, and developed a relationship with his children, with whom he remained actively involved despite being in custody. She stated that defendant had

also found religion and had become a positive influence on his family. The defense additionally submitted several letters from family and friends in support of defendant, which the court acknowledged it had reviewed.

¶ 83 Defendant further argued that a sentence greater than the statutory minimum would effectively amount to a life sentence and would improperly characterize him as among the "worst of the worst," which he contended he was not. Defendant maintained that the offense was not planned but arose from an impulsive, alcohol-fueled altercation outside a nightclub, and emphasized that he had no prior history of violent offenses.

¶ 84 In imposing the sentence, the trial court stated that it considered the evidence presented at trial, the victim impact statement, and the mitigation evidence, including the testimony of defendant's mother. The court found that the offense was "not particularly premeditated" but arose from an impulsive, alcohol-fueled confrontation outside a nightclub, and noted that defendant was not the sole participant, characterizing him as "more of a follower than a mover," while acknowledging that he nonetheless actively participated in the shooting "with the worse of circumstances." The court further considered defendant's criminal history, describing it as consisting primarily of minor offenses with one prior felony conviction, and recognized the significant impact the offense had on both the victim's family and defendant's own family. The court also noted the constraints imposed by the statutory sentencing scheme and the lack of discretion resulting from the mandatory firearm enhancement.

¶ 85 After weighing the factors in aggravation and mitigation, the trial court concluded that the statutory minimum sentence was sufficient to meet the ends of justice and declined the State's request for a greater term. The court sentenced defendant to 40 years' imprisonment, consisting of

20 years for first-degree murder and a consecutive 20-year term for the personal discharge of a firearm.

¶ 86    Defendant filed a motion to reconsider the sentence, which the court denied.

¶ 87                              E. Post Trial Proceedings

¶ 88    On May 5, 2022, defendant filed a notice of appeal. However, because the court did not rule on defendant's motion to reconsider, we dismissed the appeal for lack of jurisdiction and remanded the case to the circuit court. *People v. Walker*, 2024 IL App (1st) 220672-U.

¶ 89    On June 5, 2024, upon remand, the trial court denied defendant's motion to reconsider.

¶ 90    On June 17, 2024, defendant timely filed his notice of appeal.

¶ 91                              II. ANALYSIS

¶ 92    On appeal, defendant argues that: (1) trial counsel provided ineffective assistance of counsel by failing to impeach a witness with prior inconsistent statements; (2) the trial court committed reversible error in failing to ensure that jurors would not hold defendant's decision not to testify against him; and (3) his 40-year sentence violates the proportionate penalties clause of the Illinois Constitution.

¶ 93                         A. Ineffective Assistance of Counsel

¶ 94    Defendant first contends that his counsel was ineffective because he failed to impeach a witness with prior inconsistent statements and, as a result, was prejudiced due to the nature of the State's case. The State responds that counsel pursued a reasonable trial strategy, and even if counsel's representation was unreasonable, defendant cannot establish prejudice.

¶ 95    The court indulges a strong presumption that an attorney's conduct falls within a wide range of reasonable professional conduct. *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). In evaluating claims of ineffective assistance, we assess the totality of the circumstances and

recognize that a defendant is entitled to competent, not perfect, representation. *People v. Valladares*, 2013 IL App (1st) 112010, ¶ 52. Accordingly, to prevail on an ineffective assistance of counsel claim, a defendant must (1) show that counsel's representation fell below an objective standard of reasonableness and (2) that counsel's shortcomings were so serious as to deprive the defendant of a fair trial. *Albanese*, 104 Ill. 2d at 524 (adopted from *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). A defendant must establish both prongs of the *Strickland* test, and the failure to establish either precludes a finding of ineffective assistance of counsel. *People v. Cherry*, 2016 IL 118728, ¶ 18.

¶ 96 Defendant argues that counsel's failure to impeach Young was objectively unreasonable because she was the only State witness who personally knew defendant and claimed to have seen him with a gun immediately before the shooting, making her a critical witness for the State. He contends that trial counsel's failure to confront Young with her prior inconsistent statements to detectives in which she repeatedly denied seeing anyone with a gun was unreasonable. Defendant maintains that no sound trial strategy justified this omission, particularly where counsel's theory at trial relied on highlighting inconsistencies among the State's witnesses and specifically attacking Young's credibility.

¶ 97 The relevant portions of Young's interview with detectives Bensel and Decicco are as follows:

> [Young]: I probably got out of the car and looked. But other than that, like me seeing somebody with a gun, no, I didn't see it. I didn't see it. I'm sorry. I didn't see nobody with no gun. I didn't know—nobody had a gun.
>
> I didn't see no gun. I'm sorry. I didn't see three guns. I didn't see no gun.

[Detective Bensel]: . . . You all got out of the car. They exited that vehicle with pistols.

[Young]: See I never seened [sic] a gun on them. I never seened it.

[Detective Decicco]: Three guns in the car you're driving and you've never seen them?

[Young]: Never seen the guns. I never seen like visible, never. I probably should— I never seen the gun.

[Bensel]: We believe and we know you turned back around and dropped them off so they could shoot these people.

[Young]: No, I really didn't. I didn't never see a gun. This was what I'm telling you.

[Decicco]: Did you see them get out of the car with the guns?

[Young]: No, I didn't. I didn't see it. If I did, hey, I would say it, but I didn't. . . . I didn't know that there were guns in the car. And when I drove up, I never seen nary a one of them get out of the car with a gun.

¶ 98   The State points out that later in Young's interview with the detectives, she admitted that defendant was in the passenger seat next to her and she witnessed defendant grabbing a gun from the glove compartment.

¶ 99   The decision on whether to cross-examine or impeach a witness is a matter of trial strategy, which is immune from a claim of ineffective assistance of counsel. *People v. Franklin*, 167 Ill. 2d 1, 22 (1995). Our supreme court has held that "[t]he manner in which to cross-examine a particular witness involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court." *People v. Pecoraro*, 175 Ill. 2d 294, 326-327 (1997). Errors in trial

strategy, tactics, or judgment alone do not render counsel's representation deficient. *Valladares*, 2013 IL App (1st) 112010, ¶ 52. Thus, a defendant can only prevail on an ineffective assistance claim by showing that counsel's approach was objectively unreasonable. *Pecoraro,* 175 Ill. 2d at 327.

¶ 100   At trial, defense counsel cross-examined Young in detail, highlighting inconsistencies in her account and challenging her credibility, including her statements surrounding the events leading up to the shooting. Counsel additionally cross-examined other State witnesses and elicited testimony to expose inconsistencies and limitations in their observations.

¶ 101   Based upon our review of the proceedings, we find it entirely possible that counsel found impeaching Young would have been more detrimental than beneficial. See *People v. Perry*, 224 Ill. 2d 312, 345 (2007) (counsel not ineffective for deciding not to object to statements and run the risk of the declarants being called to testify where they could have offered even more damaging evidence). We hasten to point out that during Young's interview with the detectives, she both denied and admitted seeing defendant with a gun. Thus, any attempt by defense counsel to impeach Young with her earlier denials risked highlighting her subsequent admissions and undermining portions of her testimony favorable to the defense. We cannot say that counsel's decision not to pursue that line of impeachment was unreasonable.

¶ 102   Defendant cites to *People v. Vera,* 277 Ill. App. 3d 130 (1995) and *People v. Hobson*, 2014 IL App (1st) 110585, neither of which supports his ineffective assistance claim. In *Vera*, the defendant was convicted of aggravated battery in a case where the evidence was closely balanced, and the central issue was the identity of the shooter, with multiple witnesses offering conflicting accounts as to who fired the gun. *Vera*, 277 Ill. App. 3d at 140-141. The court found counsel ineffective where he failed to properly impeach key eyewitnesses and present readily available

evidence that directly supported the defense's theory that another individual was the shooter, noting that the trial court itself relied on the absence of impeachment in assessing credibility. *Id*. The court further emphasized that these failures deprived the court of critical evidence and rendered the proceedings unreliable. *Id*. However, unlike in *Vera*, and as we discuss later, the evidence here was not closely balanced, the State's case did not depend on conflicting identifications of the shooter, and the alleged impeachment of Young does not similarly undermine the central issue of identity or the overall reliability of the verdict.

¶ 103   In *Hobson*, the defendant was found guilty of murder largely based on the testimony of a detective and prior statements obtained from witnesses whose credibility was already in question. *Hobson*, 2014 IL App (1st) 110585, ¶¶ 4-13. The defendant argued that counsel was ineffective for failing to impeach the detective with evidence showing that he knew of an outstanding warrant for a key witness, directly contradicting his testimony and casting significant doubt on the veracity of his testimony as a whole. *Id*. ¶ 27. The court agreed, emphasizing that the detective's credibility was central to the State's case and that the failure to impeach him was particularly prejudicial where the remaining evidence consisted largely of recanted or unreliable witness statements. *Id*. ¶ 29.

¶ 104   Here, however, unlike in *Hobson*, impeachment of Young's testimony would not have undermined the core of the State's case or call into question the overall evidentiary foundation supporting defendant's conviction. The State offered a plethora of evidence and witness testimony that detailed the events leading up to and including the shooting. Defendant has not demonstrated that Young's testimony was central to the State's case, nor does he account for her later statement to detectives in which she admitted observing defendant with a firearm prior to the shooting. We find no lack of judgment in what we believe to have been sound trial strategy.

¶ 105   Defendant argues that he was prejudiced because the State's case was weak and internally inconsistent. He contends that the eyewitness identifications were unreliable and conflicted in material respects, and that Young's unimpeached testimony improperly bolstered the State's case by creating a false impression of consistency despite her prior contradictory statements. Defendant asserts that Blakes and Bowdry had been drinking, had limited opportunities to observe the shooting, and offered inconsistent accounts, including uncertainty about the number of shots fired and the presence of multiple shooters, which he argues is contradicted by the physical evidence. He further maintains that the surveillance footage did not clearly depict the shooter and that forensic evidence linked a recovered firearm to another individual rather than defendant. Defendant also challenges the remaining identifications, noting discrepancies in descriptions of his clothing, one security guard's inability to identify him, and inconsistencies between others' prior statements and trial testimony. Based on these deficiencies, defendant argues that, had counsel effectively impeached Young, there is a reasonable probability the outcome of the trial would have been different, warranting reversal and remand for a new trial.

¶ 106   We disagree. To establish prejudice under *Strickland*, the defendant must show that a reasonable probability exists that the result of the trial likely would have been different but for the alleged ineffective representation. *People v. Hale*, 2013 IL 113140, ¶ 18. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶ 107   Here, the State presented multiple eyewitnesses who identified defendant as the shooter and described a consistent sequence of events leading up to the shooting, including the initial altercation, the departure and return of the white vehicle, and defendant's reengagement with Ross in the valet lot and alley. Blakes and Bowdry both testified that defendant initiated a second confrontation and fired at Ross at close range, and each identified defendant in photo arrays and

lineups shortly after the incident. Notably, " '[a] single witness' identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification.' " *People v. Williams*, 2015 IL App (1st) 131103, ¶ 69 (quoting *People v. Slim*, 127 Ill. 2d 302, 307 (1989)).

¶ 108   Additionally, there was testimony from security personnel and other witnesses who placed defendant at the scene, corroborated the progression of events, and supported the occurrence of multiple gunshots. Although defendant points to inconsistencies in witness accounts and challenges their viewing conditions, the jury heard and weighed those issues, including cross-examination regarding their ability to observe and prior statements given to detectives. Resolution of any inconsistencies in the evidence was for the jury to decide. *People v. Ware,* 2019 IL App (1st) 160989, ¶ 45. Further, the evidence, including surveillance footage and testimony regarding the recovery of firearms and ballistic evidence, supported the State's theory that multiple shooters were involved and did not preclude defendant's participation. In light of this evidence, Young was not the sole or indispensable witness linking defendant to the offense, and her impeachment would not have substantially altered the evidentiary picture. Thus, defendant cannot establish prejudice.

¶ 109   In sum, defendant points to nothing which would support a finding that defense counsel's performance was unreasonable or that he was deprived of a fair trial. Because defendant is unable to satisfy either prong of the *Strickland* test, his ineffective assistance of counsel claim fails.

¶ 110                                    B. Rule 431(b) Admonishment

¶ 111   Defendant next contends that his conviction should be reversed and the case remanded for a new trial because the trial court failed to properly admonish the potential jurors as required by Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), commonly referred to as the four *Zehr* principles (see *People v. Zehr*, 103 Ill. 2d at 469). Specifically, defendant argues that the court

failed to ask the prospective jurors whether they understood and accepted that defendant's failure to testify could not be held against him. Defendant concedes that he failed to preserve this issue, and asks that we review it under the plain-error doctrine. The State concedes that the court failed to comply with the *Zehr* requirements, but asserts that the error did not rise to the level of plain error.

¶ 112   Generally, a defendant must object to the alleged error when it occurs and raise the issue in a posttrial motion to preserve an issue for review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, the plain-error doctrine, as defined in Illinois Supreme Court Rule 615(a) provides, in part, that: "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). As such, the plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider an unpreserved error. *People v. Fort*, 2017 IL 118966, ¶ 18.

¶ 113   In a plain-error analysis, we must first determine whether a clear or obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). This requires us to examine the issues presented closely. *People v. Johnson*, 208 Ill. 2d 53, 64 (2003). Absent an error, there can be no plain error, and the procedural bar must be enforced. *People v. Eppinger*, 2013 IL 114121, ¶ 19. However, if we find a clear or obvious error has occurred, the defendant then bears the burden of demonstrating that the error was prejudicial. *People v. Darr*, 2018 IL App (3d) 150562, ¶ 48. A defendant may establish prejudice by showing either that the evidence at trial was so closely balanced that the guilty verdict may have resulted from the error, or that the error was so serious that it denied the defendant a fair trial. *People v. McLaurin*, 235 Ill. 2d 478, 489 (2009).

¶ 114   Rule 431(b) requires the court to "ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is

presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her[.]" Ill. Sup. Ct. R. 431(b).

¶ 115 Defendant does not dispute that the court advised the jurors of the first three *Zehr* principles. He contends only that the trial court failed to address the fourth principle. As we previously noted, the State concedes, and the record bears out, that the court failed to properly admonish the jury on the fourth principle. With respect to the fourth principle, the record reflects that the court admonished the jury that the defendant did not have to prove his innocence and that he had a right not to testify, which was "perfectly acceptable under the law." The trial judge then inquired as to whether any juror did not understand the "concept" that the court explained. The court did not, however, inquire as to whether any member of the jury would hold the defendant's decision not to testify against him. Accordingly, the court's failure to provide the fourth principle constituted clear error.

¶ 116 However, our supreme court has held that "[w]hile the failure to ask all four *Zehr* questions might constitute a violation of Rule 431(b), the [trial] court's failure to comply with Rule 431(b) does not automatically compel reversal." *People v. Glasper*, 234 Ill. 2d 173, 199-201 (2009); *People v. Thompson*, 238 Ill. 2d 598, 611 (2010) (same). In *Glasper,* the court explained that automatic reversal is warranted only for errors deemed "structural." *Id*. at 197. An error is considered structural if it undermines the fundamental fairness of the trial or renders it an unreliable means of determining guilt or innocence. *Id*. at 197-98. The court determined that noncompliance with Rule 431(b)(4) did not implicate a fundamental right but instead constituted a violation of a supreme court rule, which does not require reversal in every case. *Id*. We recognize

that *Glasper* considered an earlier version of Rule 431(b). However, in *Thompson*, our supreme court extended the reasoning of *Glasper* to the amended version of Rule 431(b), concluding that "although compliance with Rule 431(b) is important *** [it] does not require automatic reversal of defendant's conviction." *Thompson*, 238 Ill. 2d at 611. Notably, our supreme court has ruled that "a rule 431(b) violation is not cognizable under the second prong of the plain error doctrine, absent evidence that the violation produced a biased jury." *People v. Sebby,* 2017 IL 119445, ¶ 52.

¶ 117   Defendant raises no claim of a biased jury. He argues instead that first-prong plain error occurred because the evidence in his case was closely balanced. In that regard, he argues that the State relied on inconsistent eyewitness testimony, surveillance footage that did not clearly show the shooter, and physical evidence that, in his view, pointed more strongly to another individual. He further contends that counsel's failure to impeach Young with her prior statements denying that she saw anyone with a gun improperly strengthened the State's case.

¶ 118   "Where the defendant claims first-prong plain error, a reviewing court must decide whether the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *Sebby*, 2017 IL 119445, ¶ 51. "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Id*. ¶ 53. Our inquiry "involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id*.

¶ 119   We have examined thoroughly the evidence presented in this case and find that it was not closely balanced. Briefly, defendant was charged with first-degree murder based on the theory that he personally discharged a firearm, causing the death of Ross. At trial, the central issue was the identity of the shooter and whether defendant was the person who fired the weapon at Ross.

Multiple witnesses identified defendant as the person who confronted Ross after the initial altercation, led him toward the rear of the valet lot, and then fired at him. Blakes, Bowdry, Story, and Franco each placed defendant at the center of the events immediately preceding the shooting, and both Blakes and Bowdry identified defendant shortly after the incident in photo arrays and again in lineups. Although defendant points to inconsistencies in their testimony and the limitations of the surveillance footage and forensic evidence, those matters were fully explored before the jury through cross-examination. Moreover, as we stated earlier, conflicts in the witnesses' testimony was for the jury to resolve and apparently they were resolved unfavorably to defendant. *Ware*, 2019 IL App (1st) 160989, ¶ 45. Further, Young's testimony was not the only evidence linking defendant to the shooting, and any impeachment of her testimony would not have fundamentally altered the evidentiary picture presented at trial. Accordingly, defendant has not demonstrated that the evidence was closely balanced.

¶ 120    Although the trial court's failure to properly instruct the jurors was error, because defendant suffered no prejudice, the error did not rise to the level of plain error. Thus, we honor the procedural bar.

¶ 121                        C. Proportionate Penalties Clause

¶ 122    Defendant's final argument on appeal is that his 40-year sentence violates the proportionate penalties clause because he was 22 years old at the time of the offense, had a difficult upbringing, and committed what he characterizes as an impulsive, adolescent-type crime. He contends that the trial court itself recognized the impulsive nature of the offense and that such characteristics, in his view, are the type courts have identified as warranting heightened sentencing protections. Citing to various studies on brain development, he asserts that "brain development continues into

individuals' mid-20s." Given his personal characteristics and the particular facts of this case, defendant asks that we remand his case to the trial court for resentencing.

¶ 123    The proportionate penalties clause of the Illinois Constitution states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, §11. A violation of the proportionate penalties clause occurs when the imposed punishment is cruel, degrading, or so grossly disproportionate to the offense that it shocks the community's conscience. *People v. Leon Miller*, 202 Ill. 2d 328, 338 (2002). Whether a penalty shocks the community's moral sense is assessed by reference to objective indicia and the community's evolving standards of decency. *People v. Hernandez*, 382 Ill. App. 3d 726, 727 (2008). We review the constitutionality of a sentence *de novo*. *People v. Taylor*, 2015 IL 117267, ¶ 11. In applying these principles, courts weigh all aggravating and mitigating factors to balance retribution and rehabilitation. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 124    Here, defendant was convicted of first-degree murder and was subject to a mandatory 20-year firearm enhancement. As a result, the applicable sentencing range was 40 to 80 years' imprisonment, with the trial court imposing the minimum sentence of 40 years. As we have recited in the background section of this disposition substantial details of the sentencing proceedings, in the interest of brevity, we elect not to repeat them here. Suffice it to say that after weighing all the evidence and the competing factors, the trial court imposed the minimum sentence permitted under the statutory scheme, demonstrating that it credited the mitigating evidence while still accounting for the gravity of the offense.

¶ 125    Defendant's sentence falls squarely within the permissible sentencing range. Nonetheless, he asserts that the trial court should have applied the analysis in *Miller v. Alabama,* 567 U.S. 460

(2012) in determining his sentence. Defendant argues that his sentence is unconstitutional as applied to him, where the trial court did not fully consider his characteristics of youth or personal culpability before sentencing him.

¶ 126   Defendant's *Miller* based claim is without merit. To satisfy a *Miller* claim, a defendant must meet two initial threshold requirements: (1) the defendant must be a minor or young adult offender, and (2) he must have been sentenced to a natural or *de facto* life sentence. *People v. Hilliard*, 2023 IL 128186, ¶ 15. Here, defendant was 22 years old at the time of the shooting, which is above the threshold age requirement to proceed on a *Miller* claim, and as noted earlier, he was sentenced to a 40-year prison sentence, which is not a *de facto* life sentence. See *People v. Buffer*, 2019 IL 122327, ¶ 41.

¶ 127   In an attempt to bypass the strictures of *Miller*, defendant invites our attention to *People v. Williams,* 2024 IL 127304. He argues that, based on the court's reasoning in *Williams*, his age is not an automatic bar to *Miller*-based emerging-adult protections under the proportionate penalties clause. He explains that in *Williams*, our supreme court noted earlier precedent in which it had applied *Miller* protections to 18- and 19-year-old defendants. Defendant then notes the court's comment to the effect that *Williams*, being 22 years old at the time of the offense, cast doubt on the validity of his *Miller* based claims. Defendant then comments that in light of studies finding that brain development continues until the mid-20s, "it is unclear why the court [in *Williams*] expressed caution." Defendant then goes on to argue that, notwithstanding its reticence, the court "went on to address [Williams's] claim, as should the court in this case."

¶ 128   Defendant not only mischaracterizes the analysis in *Williams*, but he also misperceives its holding. In *Williams*, the *pro se* petitioner, who had been sentenced to mandatory life, appealed the dismissal of his first-stage postconviction petition which purported to state an ineffective

assistance of counsel claim. *People v. Williams*, 2024 IL 127304, ¶ 1. Underlying the claim was the petitioner's argument that trial counsel failed to argue the applicability of *Miller* based protections during Williams's sentencing. *Id.* A divided appellate court affirmed dismissal of the petition, holding that the petition lacked factual sufficiency to proceed to second-stage proceedings. *Id.* ¶ 2. Our supreme court affirmed the appellate court. *Id.* The court stated, "[e]ven if [Williams's] underlying proportionate penalties claim had an arguable basis in law, it does not have an arguable basis in fact." *Id.* ¶ 29.

¶ 129 Contrary to defendant's contention here on appeal, the court in *Williams* made no determination regarding the defendant's *Miller* based claims. The court's holding, instead, was limited to a determination of the factual sufficiency of the defendant's first-stage postconviction petition. Thus, defendant can take no solace in either the reasoning or the holding in *Williams*, as it is neither factually nor legally analogous.

¶ 130 In any case, in *Hilliard*, 2023 IL 128186, our supreme court made clear that a proportionate penalties clause claim is not limited to juveniles or to defendants serving life sentences, and that a defendant may challenge a sentence of any length under that clause. *Id.* ¶ 29. Here, defendant offers no more than his age as related to studies in emerging brain science to support his proportionate penalties claim. Based upon the facts of this case, we do not find defendant's 40-year sentence so disproportionate to the offense as to shock the moral sense of the community. As defendant's proportionate penalties claim fails, we have no basis upon which to remand this matter for resentencing.

### III. CONCLUSION

¶ 131 For the reasons stated, we affirm the judgment of the trial court.

¶ 132 Affirmed.